LOS ANGELES & SALT LAKE RAILROAD COMPANY, A CORPORATION, ET AL., APPELLANTS, *v.* EDNA L. UMBAUGH, RESPONDENT.

No. 3339

March 4, 1942. 123 P. (2d) 224.

*Leo A. McNamee* and *Frank McNamee, Jr.*, both of Las Vegas, and *Malcolm Davis*, of Los Angeles, California, for Appellants.

*A. W. Ham* and *Ryland G. Taylor*, both of Las Vegas, for Respondent.

## OPINION

By the Court, DUCKER, C. J.:

The plaintiff, respondent here, brought this action to recover damages for the death of her adopted daughter, Willa Umbaugh, who was killed on the 10th day of November 1938 in a collision between the truck in which she was riding and a passenger train alleged to have been operated by the said railroad company. The truck was being driven by plaintiff's husband, father of the deceased child by adoption, who was also killed. The child was eleven years of age.

The collision occurred at the Charleston Boulevard in the city of Las Vegas, within the yard limits of the railroad company. The amended complaint contains two charges of negligence against the railroad company; (1) that it caused its trains to cross said boulevard at a great and negligent rate of speed of more than fifty miles per hour and without sounding any bell or whistle, and (2) that it failed to maintain at said crossing any automatic signalling device, flagman, gate, or other signal or warning of an approaching train. The answer set up two defenses; (1) that defendants were guilty of no negligence, and (2) that the deceased, Willa Umbaugh, was guilty of contributory negligence. A jury trial resulted in a verdict of $25,000 against all defendants, who, in addition to said railroad company, were Ralph T. Salt and Ben VanBuren, engineer and fireman respectively, on the train at the time of the accident. A motion for a new trial by all the defendants was granted as to the fireman unconditionally, but as to the railroad company and engineer it was ordered that, if on or before a special date plaintiff shall serve upon them and file a remittitur in the amount of $16,985, a new trial is denied and the verdict for the residue, to wit, $8,015, shall stand as the verdict on which a judgment will be entered; otherwise they will be granted a new trial.

Within the time limited plaintiff filed with the clerk of the court, her remittitur, remitting of the judgment theretofore filed and recorded, the sum of $16,985, which resulted in the denial of the motion for a new trial as to the railroad company, and the engineer. Their appeal is from the order and judgment. The railroad company will be generally referred to as such.

The home of plaintiff, husband and child, was near the southwesterly outskirts of Las Vegas and they usually came into the city in the truck, traveling easterly over the Charleston Boulevard, which crosses the railroad company's main track at grade. The father and child were traveling the usual route when killed. It was

about 7: 35 a. m. and he was on his way to his place of business in Las Vegas, intending to leave the daughter at school. In the vicinity of the crossing the railroad track is a straight track extending north and south. The grade of the track is downward towards the city, a fall from the south to north of 4.39 feet in 2,500 feet, .169 percent, and constant both ways from the crossing. There are no obstructions at or near the crossing. One approaching it on the boulevard from the west can see some distance along the railroad track to the south. At the time of the accident there was no automobile signalling device maintained at the crossing, nor wig-wag, nor flagman, nor gate. The engineer testified that he was acquainted with these conditions. The train was two hours and thirty-seven minutes late on this morning.

A number of errors are assigned within the general one that the court erred in overruling defendant's motion for a new trial. The first two, which can be considered together, go to the action of the court in overruling their objections to two hypothetical questions propounded to plaintiff's witness, Ralph D. Baker, and in denying their motion to strike his answers to these hypothetical questions.

The questions were as follows: (1) "Doctor, assuming that a train is moving upon a straight track; that the rails are dry; that the fall or downgrade is 4.39 feet to the twenty-five hundred feet, or a downgrade of .169 percent, and the train is composed of the following: one engine, one tender, two baggage cars, one baggage dormitory car, two dining cars, one observation car and five standard Pullman cars; that the engine had four driving wheels on each side, or eight driving wheels all told; that the tender had four wheels on each side or eight wheels all told; that the train was equipped with standard Westinghouse air brakes; that the entire braking equipment was in good order for the entire train; that the entire train, including the engine, tender and all cars as above, weighed 2,252,381 pounds; that the

train was moving at forty miles per hour; that the engineer of the train applied full service or full braking power to the train, can you determine approximately what distance would be required in which to stop the train?"

(2) "Doctor, Assuming a train made up and traveling as indicated in the immediately preceding hypothetical question, and the engineer applied full braking service, and the train travels after such full braking service is applied, a distance of 2,255 feet, can you tell the approximate speed of the train at the time of the application of the brakes?"

The contention is that certain factors were omitted from the questions which were essential to a determination of the speed of the train at the time the brakes were applied. The principal fact stressed as missing, was the pounds per square inch of air pressure applied to the brakes at the time. The witness testified that he could answer the question by assuming that fact from his knowledge of dynamics, and explained that he would take experimental values derived from experiments that had been performed on Westinghouse brakes and other braking systems derived from hand books published on the subject. He explained also that these experimental values were as to coefficient of friction, wind resistance and grade resistance. He explained further that in making his deductions from the experiments he would take the minimum of braking efficiency of the train, and that the statement in the question that the entire braking equipment was in good order for the entire train, would cover that particular point. The engineer had testified that the braking equipment on the train was adequate and in good order.

■■ We think the witness was competent to answer the questions. He was an expert in the field of mechanical engineering. On examination his qualifications were stated as follows: He spent two years in Rex College, which is a two-year college, and then spent three years at the University of Utah, and received the degree of

Bachelor of Science in Mechanical Engineering. After graduating he spent a year in the University and then went to the University of Kansas as an instructor in mechanical engineering. While instructing at that institution he took courses in mathematics and advanced mechanical engineering, and received the Masters Degree in Mechanical Engineering in 1931. After six years at the University of Kansas he went to California Institute of Technology where he spent three years in advanced study in aerodynamics and applied elasticity and hydraulics, and received the degree of Doctor of Philosophy in 1938. At the time of giving his testimony in this case, he was a professor in the University of Utah and had been teaching the particular subject of mechanical and aeronautical engineering since 1938. It will be seen that his qualifications as an expert in the field of mechanical arts were not of a questionable character, but very high. The field from which the witness formulated his opinion was above mere hypothetical conjecture. His technical knowledge in respect to the subject was reasonably calculated to enable him to give a considered appraisal to the values established by other recognized experts by actual experiments in answering the questions propounded. "The judgment of a skilled witness testifying as an expert may be based, in part at least, upon the results of experiments made by himself or others." 3 Chamberlayne Modern Law of Evidence, sec. 2381A.

■ After all, the witness was not called upon to answer with the exactness of a mathematical computation. The question was not so absolute. It called merely for an approximation and was so recognized by the witness, who stated that if he was going to make an accurate calculation it would have to be based upon an experiment where the conditions were the same, but that he could make an approximation.

The data from which the witness concluded as to the air pressure on the brakes, affect the weight of the testimony, and not its competency or admissibility.

■■ Counsel for defendants insist that the only evidence which would be admissible on the point in question would be evidence as to an experiment under the same, or substantially similar conditions to the case at bar. In other words, plaintiff would have to procure the same train, or one like it, run it over the same track, or, if permission could not be obtained to do this, which is quite likely, build a track of the same grade and make the experiment. It is obvious that this could not be done, and the rules of evidence are not so rigid as to prevent plaintiff from procuring what to us seems a near equivalent. The rules of evidence are not intended to be subversive of the ends for which they are adopted. Evans v. Com., 230 Ky. 411, 19 S. W. (2d) 1091, 66 A. L. R. 360.

As stated in First Nat. Bank v. Robinson, 93 Kan. 464, 144 P. 1019, Ann. Cas. 1916D, 286: "The modern notion of the admissibility of evidence is that it is more important to get the truth than to quibble over impractical distinctions."

The case of Burg v. Chicago, R. I. & P. Ry. Co., 90 Iowa 106, 57 N. W. 680, 48 Am. St. Rep. 419, cited by defendants, in which an extract from the Mechanical Dictionary was held inadmissible, is not in point or analogous. The testimony of an expert as to experimental values was not involved.

The next assignment is that the court erred in sustaining plaintiff's objection to defendant's offer into evidence of proposed exhibits A-1 and B. The former is a copy of a certified copy of a lease, dated January 1, 1936, between Los Angeles and Salt Lake Railroad Company, lessor, and Union Pacific Railroad Company, lessee, by the terms of which the lessor leased to the lessee its line of railroad, together with all rights, privileges, franchises, and rolling stock and other property appertaining thereto, owned by lessor, and all miscellaneous physical properties owned by lessor. It was certified under seal of the secretary of the interstate commerce commission to be a true copy of said certified

copy to petition for modification or extension of order filed with the commission November 21, 1935, in Finance Docket No. 9422, Union Pacific Railroad Company Unification, the original of which is on file and of record in the office of the said commission. The latter offer was a certified copy under the hand and seal of the secretary of the interstate commerce commission of the report and order of the commission issued July 26, 1935, and order of the commission entered November 25, 1935, in Finance Docket No. 9422, Union Pacific Railroad Company Unification, on file and of record in the office of said commission, by the terms of which the lease was approved.

It is claimed that issue is made under the pleadings whether the defendant company was operating the train involved in the collision, and that the proposed exhibits were material to prove that the Union Pacific Railroad Company was operating it under lease at the time. Plaintiff contends that they were immaterial because the allegations of the answer were so evasive as to raise no issue on that point, and objected to their admission on several other grounds. We are of the opinion that it matters not whether the answer made such an issue. The exhibits were, nevertheless, immaterial because no legislative authority appears exempting the lessor from responsibility to the public for the torts of the lessee. Nor was there any offer of proof in this regard. Such an exemption was essential, we think, to relieve defendant from the negligence of the lessee or its servants, and in its absence we are impelled to hold in line with considered authority that the Union Pacific Railroad Company was, in this situation, the agent of the defendant.

In Chicago, B. & Q. Ry. Co. v. Willard, 220 U. S. 413, 31 S. Ct. 460, 463, 55 L. Ed. 521, Mr. Justice Harlan, citing and quoting from Illinois cases, said:

"In Chicago & G. T. Ry. Co. v. Hart, 209 Ill. 414, 70 N. E. 654, 66 L. R. A. 75, the Supreme Court of Illinois, after referring to Elliot on Railroads, in which it is

admitted that the weight of authority was that the lessor company, unless expressly exempted by statute, was liable for injuries caused by the negligence of the lessee company, its agents and servants, said: 'We think this court is committed to the view held by the current of authorities on the question, and, moreover, that, in sound reason and as the better public policy, the doctrine should be maintained that the lessor company shall be required to answer for the consequences of the negligence of the lessee company in the operation of the road, not only to the public, but also to servants of the lessee company who have been injured by actionable negligence of the lessee company. The charter of the lessor company empowered it to construct this line of railroad and operate trains thereon. It became its duty to exercise those chartered powers, otherwise they would become lost by nonuser. The statute authorized it to discharge that duty through a lessee, and it adopted that means of performing the duty which the state had created it to perform. The statute which authorized it to operate its road by means of a lessee did not, however, purport to relieve it of the obligation to serve the public by operating the road, nor of any of the consequences or liabilities which would attach to it if it operated the road itself. 3 Starr & C. Anno. Stat. 1896,' p. 3247 [Smith-Hurd Stats. Ill. c. 114, sec. 43]. Statutory permission to lease its road does not relieve a railroad company from the obligations cast upon it by its charter unless such statute expressly exempts the lessor company therefrom. Balsley v. St. Louis, Alton & Terre Haute Railroad Co., 119 Ill. 68, 8 N. E. 859, 59 Am. Rep. 784. While the duty which rests upon the lessor companies to operate their roads is an obligation which they owe to the public, the permission given by the legislature, as the representative of the public, to perform that duty through lessees, has no effect to absolve such companies from the duty of seeing that the lessee company provides and maintains safe engines and cars, and that the employees of the lessee companies to whom is

intrusted the operation of their roads are competent, and that they perform the duties devolving upon them with ordinary care and skill; for upon the character and condition of safety of such engines and cars, and on the competency and care of such employees, depend the lives and property of the general public. As a matter of public policy, such lessor companies are to be charged with the duty of seeing that the operation of the road is committed to competent and careful hands. The general assembly of this state, though willing to permit railroad companies to operate their lines of road by lessees, refrained from relieving the lessor companies from any of their obligations, duties, or liabilities. Therefore it is that though a railroad company may, by lease or otherwise, intrust the execution of its chartered powers and duties to a lessee company, this court has expressed the view (that) the lessee company, while engaged in exercising such chartered privileges or chartered powers of the railroad company, is to be regarded as the servant or agent of the lessor company.'

"In West Chicago Street R. R. Co. v. Horne, 197 Ill. 250, 251, 64 N. E. 331, the state supreme court said that: 'The law is well settled that when an injury results from the negligence or unlawful operation of a railway, whether by the corporation to which the franchise is granted or by another corporation which the proprietary company authorizes or permits to use its tracks, both the lessor and the lessee are liable to respond in damages to the party injured,'—citing Pennsylvania Co. v. Ellett, 132 Ill. 654, 24 N. E. 559; Chicago & Erie Railroad Co. v. Meech, 163 Ill. 305, 45 N. E. 290. In the Ellett case, the language of the court was: 'The law has become settled in this state, by an unbroken line of decisions, that the grant of a franchise, giving the right to build, own, and operate a railway carries with it the duty to so use the property and manage and control the railroad as to do no unnecessary damage to the person or property of others; and where injury results from the negligent or unlawful operation of the

railroad, whether by the corporation to which the franchise is granted, or by another corporation, or by individuals whom the owner authorizes or permits to use its tracks, the company owning the railway and franchise will be liable.' Many cases in Illinois were cited by the state court in support of its view.

"It is thus made clear that if the plaintiff had any cause of action on account of the injury in question, he could bring a joint action in an Illinois court against the lessor and lessee companies. Whatever liability was incurred on account of the death of the plaintiff's intestate could, at the plaintiff's election, be asserted against both companies in one joint action, or, at his election, against either of them in a separate action."

To the same effect are Sorenson v. Chicago, etc., R. Co., 183 Iowa 1123, 168 N. W. 313; Breslin v. Somerville Horse R. Co., 145 Mass. 64, 13 N. E. 65; Hammond v. Kansas, etc., R. Co., 109 Okl. 72, 234 P. 731; McCabe's Adm'x. v. Maysville & B. S. R. Co., etc., 112 Ky. 861, 66 S. W. 1054; Georgia R., etc., Co. v. Haas, 127 Ga. 187, 56 S. E. 313, 119 Am. St. Rep. 327, 9 Ann. Cas. 677; Driscoll v. Norwich & W. Railroad Co., 65 Conn. 230, 254, 32 A. 354; Hill v. Director-General of Railroads, 178 N. C. 607, 101 S. E. 376; Smalley v. Atlanta & C. Air Line Ry. Co., 73 S. C. 572, 574, 53 S. E. 1000, 6 Ann. Cas. 868; Cogswell v. West St. & N. E. Electric Ry. Co., 5 Wash. 46, 31 P. 411; Washington A. & G. Railroad Co. v. Brown, 17 Wall. 445, 21 L. Ed. 675; Northern Pac. Ry. Co. v. Mentzer, 9 Cir., 214 F. 10; Pierce on Railroads, 283.

In Sorenson v. Chicago, etc., R. Co., supra [183 Iowa 1123, 168 N. W. 318], the court, declining to agree with a ruling of the North Carolina supreme court that an employee of a lessee could recover of the lessor for injuries sustained while operating for the lessee, said: "But while this is so, we do agree with the decision in so far as it declares why leasing or 'farming' out the franchise of a railroad will not exempt such lessor from responding for the negligence of its lessee, unless a

statute expressly exempts the lessor from responding. That reasoning is that in the absence of such exemption the lessor is estopped from setting up the lease as a defense and so release itself from liability for the negligence of its lessee, since it would be against public policy to allow a railroad corporation to put off the liability incident to its franchise while enjoying the profits that may accrue by the medium of a lease."

In Driscoll v. Norwich & W. Railroad, supra [65 Conn. 230, 32 A. 357], the court said: "A grant to a corporation of a right to lay out, construct, and operate a railroad is the grant to the corporation of the capacity to exercise a portion of the powers of sovereignty for the purpose of making pecuniary profit to itself. This is its franchise. Such grants are never made except at the request of the corporation. In return, the corporation is held to have promised to pay just damages to any person injured by any want of care in using the right so granted. As the grant is of a public right, in which every one of the public is a sharer, so the promise is to each one of the public. A due regard for the public rights obviously requires that a corporation which has asked for and received such a grant shall not be absolved from its promises except by an act of the legislature to that effect, so distinct and unequivocal as not to be open to mistake. Nothing should be left to inference."

In McCabe's Adm'x. v. Maysville & B. S. R. Co., supra [112 Ky. 861, 66 S. W. 1058] it was said: "By its acceptance of the franchises conferred by the state the corporation assumed the corresponding burdens thereby imposed. These franchises it could not transfer to another without distinct legislative authority. The grant of power to lease its property is one thing; the grant of absolution from its responsibility is another, and is not to be inferred from a mere power to lease the road, where the corporation still retains its existence and the enjoyment of its franchises in the rents. For such grants are strictly construed, and, as against the

public, are never extended by construction. In the case before us there is only a grant to the lessor of power to contract for the operating of the road. The company enjoys all its franchises in the fruits of the contract. There is nothing in the provision to show that the legislature had in mind authorizing the company to devest itself of its franchises, or permitting it, while enjoying them or their fruits, to be acquit of responsibility for their abuse, without regard to the financial ability of the lessee or his amenability to suit."

Pierce, in his work on Railroads, at page 283, states the rule as follows: "The company cannot, in the absence of special statute authority and exemption, divest itself of responsibility for the torts of persons operating its road by transferring its corporate powers, or leasing the road to them. It cannot by its own act absolve itself from its public obligations without the consent of the legislature."

■ We are not unmindful that there are authorities against the position we take. Some of these are based on the theory that the legislative authority to lease implies an exemption from liability on the part of the lessor for the torts of the lessee. 51 C. J. sec. 1138. This, in our opinion, is not a logical deduction. But the railroad company does not rest this phase of its case on any such ground. It places its reliance upon the approval of the lease by the interstate commerce commission under federal law, which, it states, is paramount to the state law. On this account it claims there is a valid lease. The question does not go to the validity of the lease between the lessor and lessee, but to whether the railroad company, which has obtained a public franchise involving the discharge of important public duties, in the careful operation of its road, can avoid such responsibilities without the consent of the state, by leasing its road to be operated by another. In consonance with a sound public policy it ought not to be so privileged. It cannot enjoy the profits flowing from a lease

and rid itself of the burden of responsibility to the public whose franchise it enjoys. We conclude that the principle that a railroad lessor is not relieved from liability for the negligence of the lessee without legislative sanction expressly exempting it, is sound and just. If such a rule be deemed too onerous, the remedy is for the legislature, or the lessor can guard itself against its effect by indemnity bond arrangements with the lessee.

■ There was no error in sustaining objections to said exhibits, or to the other offer of proof to the effect that the train in question was being operated by the Union Pacific Railway Company instead of by defendant, or in rejecting defendants' offered instruction D-41, on that point.

■ Defendants assigned as error the ruling of the trial court in denying its challenge to venireman Gerald H. Musser. Musser was thereafter excused from the jury by reason of the exercise of their third peremptory challenge. It does not appear that they would have employed another peremptory challenge, if they had been entitled to it, nor is there any suggestion that an impartial jury was not obtained. So, it is difficult to see how defendant was prejudiced by the denial of its challenge by the court. A consideration of all the prospective juror's examination touching his qualifications convinces us that the court's ruling was not open to criticism.

We come now to the instructions given and rejected. Twenty-four errors are assigned in this regard. Some of them are untenable at first glance, and these will not be referred to.

■ Defendant's requested instruction D-11A, the rejection of which is complained of, was properly refused. It contains an incorrect statement of the law in that it is assumed that the ringing of the engine bell, or sounding the whistle, or both, justified any rate of speed at the crossing, absolving the defendant, even though plaintiff's decedent was exercising reasonable care at the crossing.

We think the question of whether the speed of the train was negligence on the part of the defendant was one for the jury under the circumstances existing at the crossing. . This is so even though the trainmen complied with section 10267 N. C. L., requiring the bell to be rung, or whistle of the locomotive to be sounded at least 80 rods from the crossing, and to continue such ringing or sounding until the locomotive passed over it. (It does not appear that other regulations in this regard are required in Las Vegas.) As a general rule a high or unusual rate of speed at a crossing does not of itself constitute negligence on the part of a railroad company. A higher rate of speed may be justified in the country at unfrequented crossings than at much traveled crossings, which usually occur in cities. Greater care in the matter of speed is required in the latter class of cases and is a duty required independent of, and in addition to statutes or ordinances requiring a railroad company to perform certain precautionary acts in approaching a crossing. 52 C. J. 209–212 and cases cited in note 30. In other words, a railroad company is bound to exercise a degree of care commensurate with the danger.

As said in Pennsylvania R. Co. v. Miller, 3 Cir., 99 F. 529, 531: "* * * We cannot adopt the conclusion of counsel, that, in having performed its duty with regard to audible signals, the company thereby becomes exempt from all liability, or is relieved from the obligation of taking additional precautions to provide for the safety of the travelers upon the highway. We hold that it is the duty of railroad companies, in crossing public highways at grade, to use all reasonable care to avoid collisions, and provide for the safety of travelers who enjoy thereon privileges in common with them (Favor v. [Boston & L.] Railroad Corp., 114 Mass. 350 [19 Am. Rep. 364]) ; that the degree of care varies with the character of the crossing,—whether the view be free, or obstructed by trees, fences, buildings, or the

natural configuration of the land,—with the use made of the highway by the traveling public, and with the speed and frequency of passing trains. Whether the care actually exercised is reasonable, or whether, by the omission of such precautionary measures as were proper, or as they had accustomed travelers on highways to expect, the railroad company has been guilty of negligence, are questions of fact to be determined by the jury upon all the circumstances of the case."

While a railroad company is not required to stop its train at a public crossing (Cohen v. Eureka & P. R. R. Co., 14 Nev. 376) except as at any other place in case of a known or probable danger (Grinestaff v. New York Cent. R. R., 253 Ill. App. 589), it must regulate its speed according to the danger. Reed v. Queen Anne's R. Co., 4 Pennewill, Del., 413, 57 A. 529.

In this view of the law the following were to be taken into consideration by the jury in determining whether the speed of the train was negligence. The accident occurred within the yard limits of the defendant and the city limits of a populous city. Charleston Boulevard was a well-traveled highway. The evidence tended to show that it was traveled approximately by one hundred and fifty to two hundred cars per day. At the time of the accident there was no automatic signaling device, no wig-wag, no flagman, nor gate maintained at the crossing, and the engineer was acquainted with that condition, as well as with the fact that under the special rules of the railroad the maximum speed within yard limits for passenger trains was forty miles per hour and as much slower as rules and conditions require. These were all to be considered, as well as the fact that it was a grade crossing, with no obstructions to interfere with an approaching autoist's view of the track for a considerable distance on either side of the track. Consequently the refusal of the proposed instruction which took from the jury a consideration of those elements in determining the liability of the defendant,

was not error. Nor was there any error in rejecting defendant's proposed instruction D-18, which in part reads:

"* * * If you believe from the evidence in this case that the bell and whistle were sounded in the proper manner, and that the character of the crossing was such that an automobilist by exercising reasonable care as he approached the track could have avoided the collision, then you are instructed that the speed of the train is of no consequence in this case, and you cannot find the defendants liable on account of speed alone."

It was rejected by the court on the ground that it was covered by another instruction. This is so.

█ Complaint is made of the following instruction given by the court: "It is the duty of the person or persons operating the train, in approaching the crossing at Charleston Boulevard, prior to the collision in question, to propel and cause the said train to be propelled at a reasonable rate of speed and with due regard to the safety of such persons as might then have been crossing the highway on its tracks."

It follows from what we have already said, that the instruction is correct. 52 C. J. 179.

Complaint is next made of the court's rejection of defendants' requested instructions D-1 and D-2. The former was a request for a directed verdict in favor of all defendants, and the latter for a directed verdict in favor of the railroad company, and are discussed in connection with the assignment of error No. 9, that the evidence was insufficient to justify the verdict, and that the verdict is against law.

█ We have pointed out what circumstances the jury had a right to consider in connection with the speed of the train in determining whether the collision was due to defendant's negligence. These were amply sufficient to sustain the jury's findings in its special verdict that the railroad company was guilty of negligence proximately causing the collision, and its further finding that it was due to excessive speed. The expert

witness, in answer to questions heretofore set out, testified that at the time of the collision the train was traveling at a rate of 75.6 miles per hour. While this is an approximation, it was enough, standing alone, to sustain the jury's finding in the special verdict, that the train was traveling at the rate of 61 miles per hour. But, the testimony of one Arthur Griffith, who was driving a Studebaker truck close to the scene of the collision at the time, tended to show such speed as was found by the jury. The jury rejected the testimony of defendants' witnesses that the train was traveling about 40 miles per hour. As the negligence of the defendants was clearly established, it remains to be determined whether it was solely the cause of the death of plaintiff's decedent, or whether such decedent so far contributed to the accident by her own negligence or want of ordinary care and prudence, that, but for such negligence or want of caution, the accident would not have happened. Solen v. Virginia & T. Ry. Co., 13 Nev. 106. Did she exercise ordinary care, or was it an act of inexcusable neglect on her part in attempting to pass over the crossing? We have given the question of her contributory negligence considerable thought, but are not prepared to say that it was not for the jury. True, it was a grade crossing, and the view of the track on either side for a considerable distance was open to an approaching autoist. And it was further true that she was familiar with the crossing, having crossed it by auto almost every morning on her way to school, for five years. She knew, of course, that there was no automatic signal, device or wig-wag or flagman maintained at the crossing. On the other hand, she had the same right to the use of the crossing as the railroad company. Their rights were mutual and reciprocal. 52 C. J. 179, 180; Cohen v. Eureka & P. R. R. Co., 14 Nev. 376. The evidence discloses that she was a normal child and we must therefore assume that she saw the passenger train approaching. If she did not see it she was negligent, for she was bound to look and listen. To assume, in the absence

of all obstructions that she did not see the passenger train, would be to lean towards the absurd. The fireman testified that she was not looking at the train, but how could he tell? She would not have to look intently to see a passenger train in the open at close quarters, made up of an engine and tender, two baggage cars, one baggage dorm, one dormitory car and five standard Pullman cars. Such a combination of huge moving objects would naturally appeal to the eye by its mass and movement.

A person of normal faculties of sight and hearing is presumed to have heard and seen that which was within the sight and range of vision. When the truck came near the crossing it would have been in no zone of danger and could have passed over with a margin of safety if the train had been traveling at a proper rate of speed. There was no reasonable cause to apprehend the excessive speed at which it was moving. In fact there was assurance in the thought that the defendants would not run a train at a high rate of speed over a public crossing in the city limits. The train was traveling at an excessive rate of speed, as found by the jury. It was covering a quarter of a mile in less than fifteen seconds. In slightly less than fifteen seconds from the time the whistle sounded, 80 rods from the crossing, the train crashed into the truck. If it had been traveling at any rate of speed less than that, plaintiff's decedent would have been unharmed. Under these circumstances, with the burden of proof on the railroad company to make out the defense of contributory negligence, we are unwilling to say that it was established as a matter of law. "The law will never hold it imprudent in any one, to act upon the presumption that another, in his conduct, will act in accordance with the rights and duties of both." Newson v. New York Central R. R. Co., 29 N. Y. 383, 390. The court did not err in rejecting the request for a directed verdict, and the evidence is sufficient to justify the verdict.

Complaint is made of instruction 24 given by the

court, which reads: "If you find that the engineer and fireman, or either, discovered the decedent, Willa Umbaugh, in a position of peril near the said track . where the train was about to cross, even though she was not actually upon the track, then you are instructed that it was the duty of such engine men or man to use all reasonable precaution and efforts to prevent a collision or otherwise avoid the accident."

■■ The instruction is correct, and the objection that it was erroneously given because there was no allegation in the amended complaint of negligence based on the last clear chance doctrine, is not well taken. The weight of authority with which we agree, is to the effect that such an allegation is unnecessary to authorize the admission of evidence and recovery under that doctrine. 45 C. J. sec. 674, and cases cited in notes 82 and 83 on page 1102. It was appropriately said in Crowley v. Burlington, etc., R. Co., 65 Iowa, 658, 664, 20 N. W. 467, 22 N. W. 918: "It is a phase of the rights and obligations of the parties which arises upon the proofs rather than by pleading. We know of no rule of pleading which requires the plaintiff in actions of this character to confess negligence on his part, and avoid it by alleging that the defendant might have averted the injury by using proper care after the discovery of plaintiff's peril."

As stated in Mosso v. E. H. Stanton Co., 75 Wash. 220, 134 P. 941, 944, L. R. A. 1916A, 943: "It would be more logical to say that the defense of contributory negligence could not be made or submitted to the jury without confession of the primary negligence of the appellant. [Defendant.]"

In jurisdictions like this where contributory negligence is a defendant's burden of pleading and proof, it would be illogical to require an allegation of last clear chance as a prerequisite to recovery on that theory.

"In jurisdictions where contributory negligence is an affirmative defense to be alleged and proved by defendant, an allegation of this character would be superfluous." Thompson on Negligence, vol. 6, sec. 7466; Welch

v. Fargo & M. St. Ry. Co., 24 N. D. 463, 140 N. W. 680; Hanlon v. Mo. Pac. Ry. Co., 140 Mo. 381, 16 S. W. 233, .235; Powers v. Des Moines Ry. Co., Iowa, 115 N. W. 494.

In Welch v. Fargo & M. St. Ry. Co., 24 N. D. 463, 140 N. W. 680, 686, the court said: "It is also quite clear to us that in states such as North Dakota, where contributory negligence is an affirmative defense to be alleged and proved by the defendant, the doctrine of discovered peril or of the last clear chance can be urged under a general allegation of negligence in the complaint, and that the trial court did not err in so ruling."

■ The instruction is also claimed to be erroneous in that it failed to call to the attention of the jury that the doctrine could not be considered unless the deceased has been found to be contributorily negligent. If the defendants wished the instruction to be qualified in that respect, or a separate instruction given in that regard, they should have requested the same.

■ Complaint is made of the court's rejection of defendants' offered instructions D-22, D-23 and D-24. These have to do with the duty the law placed upon plaintiff's decedent as the truck approached the crossing, to look and listen for an approaching train. They were properly refused for the reason that her duty in this regard was fully covered in other instructions. For instance, the court instructed the jury as follows:

"The tracks of a railroad company are in themselves a warning of danger. If you believe from the evidence that the deceased, Willa Umbaugh, was of such age, experience and intelligence to comprehend and appreciate the danger involved in crossing a railroad track in an automobile, then you are instructed that it was the duty of Willa Umbaugh, as an occupant of the automobile involved in the collision, to look and listen for approaching trains as the automobile neared the tracks, and that it was her duty to do such looking and listening in such manner as an ordinary prudent child of like age, experience and intelligence would have done under

like circumstances. A failure on her part to look and listen in that manner would be negligence, and if you believe from the evidence that there was such negligence on her part, and that such negligence contributed proximately to the happening of the collision, then you are instructed that the plaintiff cannot recover in this action."

And again the court instructed: "If you find from a preponderance of the evidence that the deceased, Willa Umbaugh, did not exercise the amount of care that an ordinary prudent child of the same capacity to appreciate and avoid the danger would have used in the same or similar situation, for her own safety, did not use her senses of sight and hearing as an ordinarily prudent child of the same capacity to appreciate and avoid the danger under like or similar circumstances would have done, and that thereby she contributed to cause her own injuries, then your verdict will be for the defendants, regardless of any negligence on the part of the defendants, and regardless of whether or not the said deceased was a passenger."

And further the court instructed: "By contributory negligence, as used in the foregoing instruction, is meant the failure to use the same amount of care and caution that an ordinary prudent child of the same capacity to appreciate and avoid danger, would have used in the same situation. Before it can bar a recovery it must have contributed directly or proximately to the injuries sustained. However, it matters not how slightly or in what degree it contributes, provided it does contribute directly and proximately to the injuries sustained. Therefore, if from a preponderance of the evidence in this case you believe that the deceased, Willa Umbaugh, failed to use the same amount of care and caution that an ordinary prudent child of the same capacity to appreciate and avoid danger would have used in the same situation and that such want of care or caution by said Willa Umbaugh contributed directly or proximately in the slightest degree or in any manner whatever to the

cause of her death, then plaintiff cannot recover herein and your verdict must be against her and in favor of the defendants."

The question of contributory negligence was properly submitted to the jury under these instructions.

There was no error in the rulings of the court in sustaining plaintiff's demurrers to the second and third separate defenses contained in defendants' answer to the amended complaint, or in giving instructions Nos. 26 and 27. These specifications of error involved the question of the negligence of the husband of the plaintiff as a bar to recovery by her for the death of Willa Umbaugh.

■■ We do not think that the negligence of the husband can, under the facts of this case, be successfully invoked so as to defeat the wife's right of recovery. The principle applicable here is discussed in Macdonald v. O'Reilly, 45 Or. 589, 78 P. 753, 754, and quoted by the trial judge in this case.

"But the contributory negligence which will bar a recovery must be that of the person from whom the cause of action is derived, or the beneficiary, or some one standing in such a relation to the beneficiary that the maxim, 'Qui facit per alium facit per se,' may be invoked. 16 Am. & Eng. Enc. (1st ed.) 447. A wife does not, from the mere marital relation, however, occupy such a position in the care and custody of a minor child. Under our statutes, the right and responsibility of the parents in that regard are equal, and the mother is as fully entitled to the custody and care of the children as the father. * * * The doctrine to be found in some of the books, therefore, that because the father is the legal custodian of the children, or because of the identity of the parents the law will assume that the mother is the agent of the father, for whose negligence he is responsible, can have no application. A mother is not the agent of the father in the care of the children, any more than the father is the agent of the

mother. They are both equal before the law. The common interest or common duty of the parents toward the children will not of itself make one the agent of the other, or responsible for that other's negligence. Such seems to be the result of the decided cases in states where the doctrine of imputed negligence is not recognized."

In support of the latter statement the court cites and quotes liberally from courts of other jurisdictions, among which is the leading case of Atlanta & C. Air-Line Ry. Co. v. Gravitt, 93 Ga. 369, 20 S. E. 550, 556, 26 L. R. A. 553, 44 Am. St. Rep. 145. In that case the boy killed by the defendant railroad company was eleven years of age and was accompanied by his uncle in whose charge he had been placed by his father. The suit was brought under the statute by the mother for her benefit. The negligence of the father contributed to the death of the child. Upon the question of whether his negligence could be imputed to the mother, the court said:

"Under the facts of the present case, the father was in no sense acting as the agent of, or in any manner representing, his wife. Only upon the idea of identity of interest could the act of one be regarded as that of the other. We have already shown that the rule which once obtained, whereby, upon the theory of 'identity' or agency, the negligence of a father was imputed to his infant child, has been utterly repudiated in most jurisdictions, and no longer has any firm footing in the law of this country. The same reasons which have been urged against the injustice and harshness of that rule apply equally well to so indefensible a doctrine as that which would seek to charge a wife with the negligence of her husband simply because of the marital relation existing between the two. Like the child, the wife has distinct, individual, legal rights, which cannot be defeated simply by showing that another, to whom she was related by ties of wedlock, but over whom she exercised at the time no control, was guilty of negligence

concurrent with that of the defendant. Incidentally, the husband might derive some benefit from a recovery by her; indeed, upon her death, might inherit her estate, including the money so recovered. This, however, would likewise be true in a case where a child was allowed to recover, despite the negligence of its father; and yet this is universally held not to be a sufficient reason for unjustly depriving the child of its legal rights, as against a wrongdoer entitled to no protection whatsoever, as to liability growing out of his own gross misconduct. It would seem that the efforts on the part of the courts of an earlier day to formulate rules which would extend the doctrine of imputable negligence so as to include persons other than those who actually sustained towards each other the relation of master and servant or principal and agent, or who were jointly engaged in the prosecution of a common enterprise, have proved to be entirely unsuccessful legal ventures. Such rules have already met the fate which must inevitably, sooner or later, have befallen them, for they stand upon no foundation of logic, wisdom or justice."

 In the foregoing opinion the court cited an extract from the case of Louisville, etc., Ry. Co. v. Creek, 130 Ind. 139, 29 N. E. 481, 482, 14 L. R. A. 733: "A husband and wife may undoubtedly sustain such relations to each other in a given case that the negligence of one will be imputed to the other. The mere existence of the marital relation, however, will not have that effect. In our opinion, there would be no more reason or justice in a rule that would, in cases of this character, inflict upon a wife the consequences of her husband's negligence, solely and alone because of that relationship, than to hold her accountable at the bar of eternal justice for his sins because she was his wife."

 This admirable statement of the law was also noted by the court below in its opinion that the negligence of plaintiff's husband was not imputable to her. There was no relation between the husband and wife in this case to take it without the rule stated in the

foregoing cases. The marital relation was not enough, and aside from this, the facts do not disclose that they stood in such relation of privity that the maxim, qui facit, per alium facit per se, directly applies. See, also, Phillips, et al. v. Denver City Tramway Co., 53 Colo. 458, 128 P. 460, 461. Ann. Cas. 1914B, 29; Herrell v. St. Louis-S. F. R. Co., 324 Mo. 38, 23, S. W. (2d) 102, 69 A. L. R. 470.

██ ██ Defendants contend that the right of action given the wife by section 8553 N. C. L. is in the nature of a community right, and consequently the proceeds therefrom would be community property. Hence they argue that being infected with the negligence of a member of the community, the rule of imputable negligence should apply. We are of the opinion that the right given the wife or husband by that section is not a community right. The section, so far as it is pertinent here, reads: "The father and mother jointly, or the father or the mother without preference to either, may maintain an action for the death or injury of a minor child, when such injury or death is caused by the wrongful act or neglect of another. * * *"

The proceeds from the exercise of the right by the wife under this section, do not come within the meaning of the word "acquired" used in sec. 3356 N. C. L., defining community property as construed by this court in Fredrickson & Watson Construction Co. v. Boyd, 60 Nev. 117, 102 P. (2d) 627, 629. We there held that it was employed "in the more restricted sense of embracing wages, salaries, earnings or other property acquired through the toil or talent or other productive faculty of either spouse."

We will not prolong this opinion by further discussion of errors assigned by defendants. We have examined all of them, including those claimed as to the giving of instruction No. 43, and the rejection of defendants' offered instruction D-26, and find them to be without merit. The jury was well instructed on all phases of the case.

██ ██ Respondent assigns as cross error the action of the court on the motion for a new trial, in reducing the damages assessed from $25,000 to $7,500. Defendants' objection to a consideration of the cross error on the ground that it was waived, is well taken. The order reducing the damages was one that respondent could have appealed from if she had declined filing the remittitur and stood on the verdict as rendered. This she did not do, but consented to the order by filing the remittitur. She could not then have appealed, for no appeal will lie from a consent order or judgment. 3 C. J. 671; 4 C. J. S., Appeal and Error, sec. 213; Agnew v. Baldwin, 136 Wis. 263, 116 N. W. 641.

The judgment and order denying the motion for a new trial should be affirmed.

It is so ordered.

### ON PETITION FOR REHEARING

April 7, 1942.

*Per Curiam:*

Rehearing denied.