ALVA LA SALLE KITSELMAN, APPELLANT, v. MARJORIE KITSELMAN DUNN HANSON O'SHEA RAUTZAHN, RICHARD RAUTZAHN, LESLIE K. FIGUEROA, THE SAGE, INC., A NEVADA CORPORATION, PYRAMID LAKE RANCH, INC., A NEVADA CORPORATION, KATHRYN N. DRACKERT, HARRY DRACKERT, AND WALTER L. PATTRIDGE, RESPONDENTS.

No. 3605

June 21, 1951.                    232 P.2d 1008.

*Clyde D. Souter,* of Reno, for Appellant.

*Craven & Busey,* and *R. C. Bennett,* all of Reno, for all Respondents save the Drackerts.

*Cantwell & Loomis,* of Reno, for Respondents Kathryn N. Drackert and Harry Drackert.

## OPINION

By the Court, MERRILL, J.:

This is an appeal from order of the trial court denying motion for new trial. Suit was brought by the appellant as plaintiff to recover shares of stock representing ownership of the Pyramid Lake Ranch located in Washoe County, Nevada, and for an accounting of corporate profits realized from the operation of the ranch. The stock had been assigned by appellant to his sister, respondent Marjorie Rautzahn, and by her to the parties' mother, respondent Figueroa. The interests of the remaining parties respondent do not concern us in this appeal.

Appellant contends that he was legally incompetent on the occasion of the execution of the assignment. The trial court found him to be competent and entered judgment accordingly. Motion for new trial was made by appellant upon four grounds and was denied upon all. This appeal, through four assignments of error, entails a review of each of the grounds so presented. The principal ground was insufficiency of the evidence to justify the decision of the trial court.

Appellant purchased the Pyramid Lake Ranch in 1936 and commenced operation of the property as a guest ranch. In 1937 he incorporated "The Sage, Inc." and transferred the ranch property to this corporation taking corporate stock in exchange. Appellant's operation of the ranch was not successful financially. In 1937 he was already hard pressed by creditors and to avoid losing the ranch entered into an agreement with his sister, respondent Marjorie Rautzahn, whereby she assumed the obligations of the corporation and agreed to make certain desired improvements on the ranch. In exchange, appellant assigned his corporate stock to her with an option to take it back after five years upon reimbursing her for the amounts expended by her pursuant to agreement. Marjorie Rautzahn then assumed management of the ranch. On August 29, 1940, appellant, by gift in writing, released to his sister all of his interest under his option in the corporation and the ranch. This gift was subsequently ratified by formal written assignment to his sister, executed by appellant April 24, 1941. Shortly thereafter Marjorie Rautzahn assigned the stock and all interest she had in the ranch to respondent Figueroa who has since claimed title thereto.

The essential question presented by the suit is appellant's competence to execute the gift and assignment in 1940 and 1941. The essential question upon this appeal is the sufficiency of the evidence to justify the decision of the trial court that appellant was competent.

This court has frequently ruled that where there is a substantial conflict in the testimony and some substantial evidence in support of the findings of the lower court those findings will not be disturbed; that "the weight of the evidence and the credibility of the witnesses is within the exclusive province of the trial court." Jones v. West End Con. M. Co., 36 Nev. 149, 134 P. 104, 106.

Appellant concedes this general rule but contends that the case before us falls within the well-recognized exception as stated in Watt v. Nevada Central Railway Co.,

23 Nev. 154, 44 P. 423, 427, 46 P. 52, 726, 62 Am.St.Rep. 772 (and followed in Smith v. Goodin, 46 Nev. 229, 206 P. 1067) :

"If there be no substantial conflict in the evidence upon any material point and the verdict or decision be against such evidence upon such point, or where the verdict or decision strikes the mind, at first blush, as manifestly and palpably contrary to the evidence, the supreme court will direct a new trial."

We are unable to concur with appellant in his contention. In our view this is a case for application of the general rule rather than of the exception.

Appellant's incompetence is predicated in his pleadings and his own testimony upon temporary loss of memory. He testifies: that his physical and mental condition was weakened by the practice of Yoga; that in 1940 following the death of his father and of his sister's husband, he offered to relieve his sister of the ranch operation; that he was advised by her and subsequently by her attorney that, notwithstanding his agreement, he had no further interest in the ranch; that the shock which these statements caused to him in his weakened condition induced a complete lapse of memory for a period of about two years during which period of "blackout" the gift and assignment in question were executed.

In support of plaintiff's contention of incompetence six witnesses testified to his activities during or shortly prior to the period of "blackout." From their testimony it most certainly must be conceded that appellant was possessed of an extraordinary talent for idiosyncrasy and unusual intellectual pursuits. (A catalogue of his accomplishments in this field, while no doubt providing interesting reading, would hardly serve any other purpose.) In opposition, respondents Figueroa and Marjorie Rautzahn supported by one disinterested witness, testified that, notwithstanding his unusual mode of living and unusual business and intellectual interests during

the "blackout" period, appellant was then fully competent and as normal as he subsequently was at the time of the trial.

It may be said of counsel for all parties that the art of cross-examination was most effectively demonstrated upon these witnesses. In the record before us we have had the benefit of some 350 pages of testimony, from a study of which it would require the wisdom of Solomon to ascertain the truth of appellant's condition at the time in question. The task was most conscientiously undertaken by the trial court. Its opinion upon motion for new trial formed a document of over fifty pages in which the testimony of each witness is carefully analyzed and weighed. That the demeanor of witnesses upon the stand was an important consideration in the court's conclusions is made most apparent. Here, indeed, would appear to be the ideal case to exemplify the propriety of the general rule as stated.

While refuge might well be taken in that rule it would, we feel, be unfair to the trial court thus to dispose of the matter. In our view, the strength of respondents' case lies more in documentary evidence than in the oral testimony. The record contains over 150 pages of correspondence between appellant and others, which provides substantial support for the decision of the trial court. This correspondence divides itself into two periods: the "blackout" period and the time subsequent thereto.

During the period of "blackout" itself, appellant conducted a most enlightened and intelligent correspondence with his mother relative to his desire to exchange certain stock holdings in Indiana Wire and Steel Co. for stock in Standard Oil Co. of Indiana, together with discussion of details of alternate plans by which the exchange might be effected. During this period his correspondence on this and other subjects shows no lack of memory of past events and no lack of competence. This period terminated, as closely as appellant can fix it, in September,

1942. The month previous, however, he sufficiently recollected the gift to his sister to recognize it in letters to his mother and brother. On August 14, 1942, he wrote to his mother,

"I freely gave to my sister a property into which I had put $75,000.00, not counting money wasted, because she had just lost Floyd and Pop and I did not want any strife with her."

In that same letter, he wrote with reference to his brother,

"Last night Don ran into Metta and told her that I was an atheist (because I belong to no organized church) and that I was just waiting to get hold of his money. He is convinced that he will be killed in the war and what burns him up about it is that Marge and I will get his money. I sent him today a fully legal disclaimer of any possible inheritance I might ever receive from him, but I gravely doubt that he will change his opinion in the least."

Under the same date he wrote his brother,

"I *gave* Marjorie a property into which I had put $75,000.00 not counting money wasted, because she had just lost Floyd and Pop and I wanted no strife between us—yet she still considers me a bad egg."

Enclosed with that letter was a document stating in part,

"This is to certify that I hereby relinquish any and all claims that I might have in future upon any possible estate of Donald C. Kitselman."

Appellant recalled not only the gift itself (which had been made two years before) but the reasons which had impelled it. His continuing desire to avoid strife with members of his family and to present himself to them in a favorable light prompted a somewhat similar gesture to his brother.

The month following this correspondence, according to appellant's testimony, he "came back to consciousness" and learned of his gift to his sister. He did not, however, repudiate it as one might have expected him to do.

Instead he accepted the fact of the gift and proceeded to negotiate with his mother for the securing of her interests, seeking in this manner to regain control of the ranch. These negotiations proceeded through several stages.

First, one which may be described as wheedling. By letter to his mother, dated September 17, 1944, appellant writes:

"Doesn't it seem more fitting to you that I, at my age, should be the one to operate a business like the Ranch? You have the Dana place to live in, and business properties in Mexico—please, may I have the Ranch?"

Second, a stage which may be characterized as one of more businesslike approach. Under date of January 25, 1946, he wrote to his mother,

"* * * you allow me to operate the ranch on a cash basis at my own expense and buy it from you bit by bit until a total of $100,000.00 has been paid, with the understanding that you are to receive each month that portion of the profits which is proportional to the unpaid purchase price."

Third (upon rejection of such propositions), we encounter a petulant stamping of the foot. On March 7, 1946, he wired his mother, "If that ranch is lost to me I am selling out and going to Asia and not coming back."

Fourth, he resorts to accusations of fraud. On March 17, 1946, he wrote his mother, referring to his sister,

"She knows the stock-transfer is void because of fraud. She knows that both she and Thomas Craven falsely told me I had no claim to the ranch whatever and that a nuisance value of one or two thousand was all I represented, and it was only because of that fraudulent information that I 'gave' her my supposedly negligible interest in the ranch. [This in itself is a notable negation of "blackout."]

"Three claims she has—all forfeit. The first claim (the agreement) is void because of non-fulfillment of contract, but the second two are void because they are acts of deliberate fraud. Deliberate fraud, I may add,

is a criminal offense. Marge knows the truth of this, and so do you.

"I warn you, therefore, to make no effort to sell the Ranch, for *neither you nor Marge have ever owned it!"*

Not once throughout this entire period was mention made of loss of memory or lack of competence in the making of the gift.

Finally, his negotiation through its various stages proving unfruitful, appellant proceeded to contemplation of other methods of recovery. On November 11, 1946, he wrote to his mother, sister and brother:

"This is Armistice Day, commemorating November 11, 1918, when two groups of people decided to call it quits. They were still plenty sore at each other, but the strain of conflict was no longer worth the trouble.

"That is the case with me; I've had enough, and this is my final notice to that effect. I had a nice lawsuit all set to get me back my precious ranch—not the case you were expecting, based upon charges of skul-duggery and legal jugglery, but a nice, foolproof, legal angle for which you folks had obligingly furnished all the evidence. Hell with it. The three of you deserve to be dragged through a legal inquisition—but I don't see why I should have to do it. * * *"

On June 5, 1947, this action was brought. In the light of the nature of this suit, one would be justified in concluding that the "nice, foolproof, legal angle" to which appellant referred was his supposed lack of competence. In the light of the record in this case, one would be justified in concluding that the evidence which members of the family "had obligingly furnished" referred to letters written to appellant by his mother in which she dealt in a critical manner with his eccentricities. Such letters were offered in evidence by appellant and are here relied upon by him in support of his contention of incompetence. In our view they do not lend support to that contention or to the probability of loss of memory. Rather, they appeal to us as commendable efforts on the part of

a distracted mother to persuade her son from a deliberate course of extreme folly.

Appellant's first assignment of error, that the evidence is insufficient to justify the decision of the trial court, is held to be without merit.

Appellant's next assignment of error relates to "errors of law occurring at the trial" and excepted to by him. These consist (with the exception later discussed) of the admission over appellant's objection of evidence relating to the sums paid by respondent Figueroa for the stock transferred to her and to the extent of respondent Marjorie Rautzahn's disbursements for corporate debts and improvements. These points might well have been pertinent had we concurred in appellant's contention of incompetence and that grounds for rescission accordingly existed. In the light of our holding, however, any error which may have been committed in these respects is wholly immaterial.

The last assigned "error of law occurring at the trial" related to the testimony of a psychiatrist called as witness for appellant. In expressing his expert opinion as to appellant's mental condition, an objection was sustained to any conclusion of the witness based in whole or in part upon appellant's history as privately related to the witness by the appellant.

"The general rule is that the opinion of a physician or surgeon as to the condition of an injured or diseased person, based wholly or in part on the history of the case as related to the physician or surgeon in the course of an examination of the former made out of court for the purpose of qualifying the physician or surgeon to testify as a medical expert, is not admissible, * * *." 20 Am.Jur. 728 (Evidence, sec. 866). It is apparent from the record that the witness' examination of appellant was for this purpose and not for the purpose of

treatment. Accordingly, we find no error in the court's ruling.

Moreover, despite the limitations so placed upon him, this witness was still able to conclude and testify that appellant was incompetent. It is, therefore, difficult to see how appellant was prejudiced in this regard. The trial court is sustained upon this assignment of error.

Appellant's next assignment of error is that "the decision is against law" in this: that at the close of appellant's case respondent moved for dismissal of the complaint for failure of appellant to prove his case; that the motion was denied by the trial court; that in so acting the court recognized that appellant had established a prima-facie case; that subsequently respondent presented "no evidence worthy of the name" to overcome appellant's case; that the trial court, in ultimately deciding for respondent, in effect reversed itself and erred in so doing.

The fact is, however, that evidence was presented by respondents subsequent to the denial of their motion for dismissal. As already stated in this opinion, the trial court in its decision carefully weighed and analyzed the evidence. We have already determined that there was evidence to support its decision.

"The fact that the court had overruled a demurrer to plaintiff's evidence in no wise precluded it from finding for defendant, if, after hearing the whole case, it concluded plaintiff had not sustained its case by a preponderance of all the evidence." Lynde-Bowman-Darby Co. v. Huff, 33 Okla. 239, 124 P. 1085, 1087.

The trial court is sustained upon this assignment of error.

Finally appellant assigns as error, failure to grant new trial upon the ground of "surprise which ordinary prudence could not have guarded against." Subsequent to the rendition of judgment by the trial court, appellant learned that the trial judge in 1938 as a practicing attorney had represented respondent Marjorie Rautzahn in an

unopposed suit for divorce. Appellant also learned that the trial judge, after the submission of this matter, had been represented by a member of the firm of Craven and Busey (counsel for respondents) in seeking a court order establishing the time and place of his birth and parentage. Appellant in moving for a new trial filed an affidavit to the effect that had these facts been known to him before trial he would have made "application for the transfer of the above-entitled cause to another department [for the reason that] I would feel and would have felt that the intimate association of Judge McKnight in acting as attorney for my sister, one of the Defendants as above stated, and his preference for the firm of Craven & Busey in representing him in a very personal matter, would unconsciously affect the judgment of even an honest Judge like Judge McKnight, or any other honest man who was placed in the same situation."

Appellant, in seeking transfer of the cause, would have been compelled to do so by disqualification of the trial judge in advance of trial. Section 8407 N.C.L. 1929, Supp. 1931–1941, provides for such disqualification by the filing of an affidavit charging bias or prejudice.

We need not here decide whether surprise may be asserted when public records display the facts nor whether the surprise here asserted is the kind of surprise contemplated by our statute. Our decision is that appellant has failed to show that any injury was sustained by his failure to seek disqualification of the trial judge at the proper time.

The facts set forth in appellant's affidavit cannot be said to establish bias or prejudice. At the most they may be said to have created a suspicion in appellant's mind that such bias or prejudice unconsciously may have existed. We find nothing in the record before us demonstrating in the slightest degree any bias or prejudice

on the part of the trial judge. As we understand appellant's position he does not even now contend that the judge in fact was biased or prejudiced. Appellant's contention is simply that he was deprived of a legal right which otherwise he would have exercised. The case would appear analogous to one where the challenge of a juror for cause was improperly sustained by the court. Such error is held to be without prejudice if the jury subsequently selected proves impartial. See, Sherman v. Southern Pacific Co., 33 Nev. 385, 111 P. 416, 115 P. 909, Ann.Cas. 1914A 287.

Moreover, in the absence of any showing of bias or prejudice, appellant has failed to establish the very basis of the legal right of which he now contends he was deprived. That he may have felt justified in charging bias or prejudice upon the basis of his suspicions alone and, under the procedural requirements of the act (which demand neither proof nor particulars), would have been able to do so, does not suffice. Notwithstanding our liberal pretrial right of disqualification, an unsupported post-trial suspicion of unconscious bias or prejudice cannot be recognized as a legitimate basis for appellant's "legal right." So to recognize it would, in effect, be to make a new trial available in every case and permit interminable and intolerable experimenting with trial judges. The trial court is sustained upon this assignment of error.

The order of the trial court denying motion for new trial is affirmed with costs.

BADT, C. J., and EATHER, J., concur.

ON PETITION FOR REHEARING

July 31, 1951.

*Per Curiam:*

Rehearing denied.