SHOSHONE COCA–COLA BOTTLING COMPANY, A CORPORATION, DBA COCA–COLA SHOSHONE BOTTLING COMPANY, APPELLANT, *v.* LEO L. DOLINSKI, RESPONDENT.

No. 5112

December 7, 1966          420 P.2d 855

[Rehearing denied January 5, 1967]

*Woodburn, Forman, Wedge, Blakey, Folsom and Hug,* of Reno, for Appellant.

*William L. Hammersmith* and *Loyal Robert Hibbs,* of Reno, for Respondent.

Amicus Curiae: *Gary Bullis* and *John Squire Drendel,* of Reno, representing Nevada Trial Lawyers Association.

## OPINION

By the Court, THOMPSON, J.:

The important question presented by this appeal is whether Nevada should judicially adopt the doctrine of strict tort liability against a manufacturer and distributor of a bottled beverage. Subordinate questions are also involved and will be discussed.

1. Leo Dolinski suffered physical and mental distress when he partially consumed the contents of a bottle of "Squirt" containing a decomposed mouse. As a consequence he filed this action for damages against Shoshone Coca-Cola Bottling Company, the manufacturer and distributor of "Squirt." His complaint alleged alternative theories of liability; breach of the implied warranties of quality (which theory this court has rejected, in the absence of privity of contract: Long v. Flanigan Warehouse Co., 79 Nev. 241, 382 P.2d 399 (1963)); negligence (Underhill v. Anciaux, 68 Nev. 69, 226 P.2d 794 (1951)); and strict tort liability. The breach of warranty and negligence claims were subsequently abandoned, and the case was presented to the jury solely upon the doctrine of strict tort liability. The jury favored Dolinski with its verdict and fixed his damages at $2,500. This appeal by Shoshone ensued.

We affirm the verdict and judgment since, in our view, public policy demands that one who places upon the market a bottled beverage in a condition dangerous for use must be held strictly liable to the ultimate user for injuries resulting from such use, although the seller has exercised all reasonable care, and the user has not entered into a contractual relation with him. Perhaps the supporting policy reasons are best expressed by William L. Prosser in his article, "The Fall of the Citadel," 50 Minn.L.Rev. 791, 799 (1966): "The public interest in human safety requires the maximum possible protection

for the user of the product, and those best able to afford it are the suppliers of the chattel. By placing their goods upon the market, the suppliers represent to the public that they are suitable and safe for use; and by packaging, advertising, and otherwise, they do everything they can to induce that belief. The middleman is no more than a conduit, a mere mechanical device, through which the thing is to reach the ultimate user. The supplier has invited and solicited the use; and when it leads to disaster, he should not be permitted to avoid the responsibility by saying that he made no contract with the consumer, or that he used all reasonable care."

In Escola v. Coca Cola Bottling Co., 24 Cal.2d 453, 150 P.2d 436, 440 (1944), Justice Traynor, in a concurring opinion, wrote: "Even if there is no negligence, public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." That point of view ultimately became the philosophy of the full court in Greenman v. Yuba River Products, Inc., 27 Cal.Rptr. 697, 377 P.2d 897 (1962). There justice Traynor wrote: "The purpose of such liability is to insure that the cost of injuries resulting from defective products are borne by the manufacturer that put such products on the market rather than by the injured persons who are powerless to protect themselves."

We believe that the quoted expressions of policy are sound as applied to the manufacturer and distributor of a bottled beverage. Indeed, eighteen states have judicially accepted strict liability, without negligence and without privity, as to manufacturers of all types of products; and six more have done so by statute. See Prosser, "The Fall of The Citadel," 50 Minn.L.Rev. 791, 794, 795, 796 (1966). Though the appellant suggests that only the legislature may declare the policy of Nevada on this subject, the weight of case authority is contra. As indicated, most states approving the doctrine of strict liability have done so by court declaration.

2. Our acceptance of strict tort liability against the manufacturer and distributor of a bottled beverage does not mean that the plaintiff is relieved of the burden of proving a case. He must still establish that his injury was caused by a defect in the product, and that such defect existed when the product left the hands of the defendant. The concept of strict liability does not prove causation, nor does it trace cause to the defendant.

In the case at hand Shoshone contends that insufficient proof was offered to establish that the mouse was in the bottle of "Squirt" when it left Shoshone's possession. On this point the evidence was in conflict and the jury was free to choose. The Vice-President and General Manager of Shoshone testified, in substance, that had the mouse been in the bottle while at his plant, it would have been denuded because of the caustic solution used and extreme heat employed in the bottle washing and brushing process. As the mouse had hair when examined following the plaintiff's encounter, the Manager surmises that the rodent must have gotten into the bottle after leaving the defendant's possession. On the other hand, the plaintiff offered the expert testimony of a toxicologist who examined the bottle and contents on the day the plaintiff drank from it. It was his opinion that the mouse "had been dead for a long time" and that the dark stains (mouse feces) which he found on the bottom of the bottle must have been there before the liquid was added. The jury apparently preferred the latter evidence which traced cause to the defendant.

We turn to the question of tampering. Shoshone insists that a burden is cast upon the plaintiff to prove that there was no reasonable opportunity for someone to tamper with the bottle after it left Shoshone's control. Underhill v. Anciaux, supra, where the claim was based upon negligence, may be read to suggest that such a burden is cast upon the plaintiff. We cannot agree with that suggestion.

The matter of tampering is inextricably tied to the problem of tracing cause to the defendant. This is so whether the claim for relief is based on negligence or strict liability. Whenever evidence is offered by the plaintiff tending to establish the presence of the mouse in the bottle when it left Shoshone's possession, the defense is encouraged to introduce evidence that the mouse must have gotten there after the bottle left Shoshone's control, thus interjecting the possibility that the bottle and its contents were tampered with by someone, perhaps as a practical joke or for some other reason. In this case, as in most cases, positive proof either way is not available. Inferences must be drawn from the best available evidence produced by each side. We have already alluded to that evidence.

It is apparent that the moment plaintiff produces evidence tending to show that the mouse was in the bottle while in the defendant's control, he has, to some degree, negated tampering by others. The converse is likewise true. A fortiori, once it is decided that enough evidence is present to trace cause to the defendant, that same evidence is sufficient to allow the jury to find an absence of tampering. For this reason, any notion that there is a burden of proof as to tampering, simply does not make sense. The sole burden is upon the plaintiff to prove that his injury was caused by a defect in the product and that such defect existed when the product left the hands of the defendant. The defendant, of course, may offer evidence suggesting tampering under a general denial of liability. Therefore, we expressly disapprove any contrary implication in Underhill v. Anciaux, supra.

The Supreme Court of Oregon is in accord. In Keller v. Coca Cola Bottling Co., 214 Ore. 654, 330 P.2d 346 (1958), the court wrote: "We hold, therefore, that there was a reasonable inference for the jury's consideration that the cigar stub entered or remained in the bottle while in the exclusive control of the defendant. It was not incumbent upon the plaintiff to prove that tampering did not exist. Having established the delivery to be in the normal course of processing and dispensing, plaintiff

was not required to negative the doubtful possibility of unwarranted or unlawful acts by other persons."[1]

3. Shoshone next complains that there was not enough evidence to identify it as the manufacturer and distributor of the bottle in question. The record shows that Shoshone manufactured, bottled, and sold "Squirt"; that it furnished one of its vending machines to the Sea and Ski plant where the plaintiff was employed; and that it delivered beverages, including "Squirt," to the Sea and Ski plant to be placed in the machine. Almost immediately after the plaintiff drank from the bottle and became ill, an employee of Sea and Ski telephoned Shoshone and reported the incident, whereupon a Shoshone salesman came to the Sea and Ski plant to investigate. On this evidence it was permissible for the jury to conclude that Shoshone was the manufacturer and distributor of the bottle in question. If the cases relied upon by Shoshone (Wilkes v. Memphis Grocery, 134 S.W.2d 929 (Tenn. 1939); Wilkes v. Jones, 139 S.W.2d 416 (Tenn. 1939); Jackson Coca-Cola Bottling Co. v. Grubbs, 108 So. 732 (Miss. 1926)), may be read to intimate otherwise, we decline to follow them.

4. The final claim of error dealing with the doctrine of strict tort liability is directed to the correctness of the jury instruction given about that doctrine. The record on appeal does not show what objection, if any, was made to the giving of that instruction. Therefore, we refuse to consider this claim of error. NRCP 51; Downing v. Marlia, 82 Nev. 294, 417 P.2d 150 (1966); Duran v. Mueller, 79 Nev. 453, 386 P.2d 733 (1963); Wagon Wheel Saloon v. Mavrogan, 78 Nev. 126, 369 P.2d 688 (1962).

---

[1]The appellant assigns as error an order by the court precluding him from arguing to the jury that someone may have tampered with the bottle and contents after it was delivered to the Sea and Ski plant where Dolinski worked. We have searched the record with care and do not find such preclusive order. The citation to the record in appellant's brief is to numbered pages of the transcript which are not contained in the record on appeal. We, therefore, do not consider this assignment of error.

5. The jury awarded Dolinski $2,500 as compensatory damages. Shoshone urges that the award is excessive. Upon drinking the "Squirt," Dolinski immediately became ill, visited a doctor, and was given pills to counteract nausea. At the time of trial more than two years later, he still possessed an aversion to soft drinks, described by a psychiatrist to be a "conditioned reflex" that could continue indefinitely. He lost 20 pounds. In these circumstances we cannot say that the damages must have been given under the influence of passion or prejudice or that our judicial conscience is shocked. NRCP 59(a)(6); Miller v. Schnitzer, 78 Nev. 301, 371 P.2d 824 (1962).

6. Finally, Shoshone asks that the judgment be reversed because the trial court allowed a psychiatrist, who did not treat Dolinski, to give opinion testimony. This claim of error is bottomed upon the rule approved in Kitselman v. Rautzahn, 68 Nev. 342, 232 P.2d 1008 (1958). In that case a psychiatrist was asked to give his expert opinion as to the mental condition of a party litigant. The trial court ruled that he could not give such opinion if it was based in whole or in part upon that party's history as privately related to the psychiatrist-witness. On appeal, the court quoted a passage from 20 Am.Jur. 728: "The general rule is that the opinion of a physician or surgeon as to the condition of an injured or diseased person, based wholly or in part on the history of the case as related to the physician or surgeon in the course of an examination of the former made out of court for the purpose of qualifying the physician or surgeon to testify as a medical expert, is not admissible." The court then concluded that it was apparent from the record that the witness examined the party for the purpose of testifying in court, and not for the purpose of treating him, and approved the trial court's exclusionary ruling.

In our view the Kitselman rule is unsound, does not promote the trial search for truth, and is not fair. NRCP 35 provides that, when the mental or physical condition

of a party is in controversy, the court may order him to submit to a physical or mental examination by a physician. That physician may later testify at trial, even though he does not treat the party. The "independent medical examination" usually is of the plaintiff, comes about at the request of the defendant, and the doctor so selected by the defendant testifies at the trial.[2] Indeed, the doctor is sometimes identified as an "insurance company" doctor, and testifies in many cases during the course of a year. If such testimony is permissible, it is difficult to understand why a doctor selected by the plaintiff for the purpose of giving his expert opinion at trial should be precluded. The fear of fabrication may exist in either instance, but that fear is not relevant to the doctor's competency as a witness, and is best allayed in the usual manner, by cross examination, jury argument and the like. It is also accepted that a non-treating doctor may give his expert opinion at trial based upon a hypothetical question.

These two examples point up the lack of fundamental fairness inherent in the Kitselman rule. California rejects the limitation that the doctor must treat the party in order to qualify as a witness. Groat v. Walkup Drayage & Warehouse Co., 14 Cal.App.2d 350, 58 P.2d 200 (1936). We now expressly disapprove the Kitselman rule and hold that a physician, who is otherwise a competent witness, may give opinion testimony on behalf of a plaintiff as to the plaintiff's physical or mental condition, even though he did not treat the plaintiff and his opinion is based, in whole or in part, upon the personal history related by the plaintiff.

COLLINS, J., and ZENOFF, D. J., concur.

---

[2] A medical examination of a defendant may also be ordered in appropriate circumstances. Schlagenhauf v. Holder, 379 U.S. 104, 13 L.Ed.2d 152, 85 S.Ct. 234 (1964).