FREDDIE LEE PORTER, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 9505

March 22, 1978 576 P.2d 275

*Morgan D. Harris,* Public Defender, and *Stephen L. Huff-aker,* Deputy Public Defender, Clark County, for Appellant.

*Robert List,* Attorney General, Carson City; *George E. Holt,* District Attorney, and *H. Leon Simon,* Deputy District Attorney, Clark County, for Respondent.

[4]Since the time in question, membership of the Gaming Control Board and the Gaming Commission has changed.

## OPINION

By the Court, MANOUKIAN, J.:

Appellant appeals from a judgment and sentences imposed against him following jury verdicts wherein he was sentenced to nine years imprisonment for robbery, (NRS 200.380), and nine years for use of a deadly weapon in the commission of a crime, (NRS 193.165), the sentences, as mandated by statute, to run consecutively.

Appellant presents four issues for our disposition. (1) Was there substantial evidence upon which to convict appellant; (2) did the trial court commit error in refusing to permit purported expert testimony; (3) does the doctrine of accumulated error entitle appellant to a new trial; and (4) did the trial court commit error in denying appellant's motion for new trial.

The victim of this crime, Wesley Speake, had been driving home from work on June 17, 1974, at about 3:30 a.m., when he noticed a disabled Cadillac convertible parked in a closed service station. The occupants, two well-dressed black couples, were attempting to remedy the mechanical problem when Speake approached and offered assistance. The Cadillac could not be restarted, and Speake offered to drive the individuals home.

After transporting the two women and one man to their respective residences, Speake drove the remaining male, who remained in the back seat, to his destination. Upon arrival, the man drew a knife, ordered Speake out of the vehicle, and demanded Speake's money. After the man had possession of the money, he ordered Speake to walk with him to another destination. Speake refused, re-entered his vehicle, and drove away.

As Speake drove away, his passenger door, unbeknownst to him, was ajar and consequently he was later stopped by police

officers. He then informed the officers of the preceding events and gave a description of the individuals. The stalled automobile was subsequently located precisely where Speake had indicated.

Shortly thereafter, police officers visited Speake's residence and exhibited several photographs of possible suspects. Speake immediately identified appellant as the robber. The officers cautioned Speake to take sufficient time to be sure, and after careful study, he again positively identified appellant as the perpetrator. The appellant was in fact the registered owner of the immobile Cadillac convertible located by the police.

An arrest warrant subsequently issued for Porter, and approximately one month following the crime, he was found hiding under a bed in his girlfriend's apartment. The arresting officer testified that Porter's girlfriend claimed Porter was not present but consented to a search. The officer also testified that the bed was so low to the floor that Porter had to have had assistance in getting under it.

During trial, Porter's defense consisted of alibi and mistaken identity. Porter's girlfriend, his sister, and his sister's boyfriend all testifed as alibi witnesses that Porter was with them on the night of the incident. There was some discrepancy in their several versions. Porter's sister and her boyfriend testified that after they had dinner with Porter and his girlfriend at the home of Porter's father, the two couples went to Porter's apartment and were together until approximately 2:00 a.m. Porter's girlfriend, however, testified that after dinner only she and Porter returned to the apartment, watched television, then fell asleep.

The mistaken identity defense was premised on Porter's purported loan of his vehicle to a John Jones. Although Porter himself did not testify, several witnesses testified that another individual had been driving the Porter vehicle. One witness stated that he saw the Cadillac, but that someone else, not Porter, was driving. The girlfriend of John Jones said that she and Jones had used the Porter vehicle several hours prior to the robbery but that upon their return home she fell asleep and had no information whether Jones returned the car to Porter. Yet another witness testified that he was one of the individuals present when Speake offered his assistance and that John Jones was the driver of the Cadillac and also the last individual to be driven home. He stated that he did not know Jones personally but heard that was the driver's name. Finally, the boyfriend of Porter's sister testified that Jones had admitted the robbery.

The State presented evidence indicating that Porter's sister and her boyfriend had been recent alibi witnesses in another

case, testifying that the accused in that case had been asleep at the time of the robbery. In addition, Speake testified identifying Porter as the person who robbed him.

The defense attempted to offer the testimony of a purported expert witness to the effect that there is little reliability associated with eyewitness identification. The trial court refused to permit such testimony.

The jury found Freddie Lee Porter guilty as charged.

A motion for a new trial was made principally on the affidavit of a court-appointed defense investigator who stated that he was present at a conversation in which John Jones, in the presence of several other people, admitted committing the robbery. During an evidentiary hearing, Jones was summoned as a witness but invoked the Fifth Amendment privilege against self-incrimination. Defense counsel also attempted to call a polygraph examiner to testify that Jones took a polygraph test and truthfully admitted committing the robbery.

The trial court denied the motion for new trial and entered judgment of conviction from which Porter appeals.

1. *Substantial Evidence.*

Appellant contends that there was no substantial evidence upon which to base a conviction. He argues that the defense produced witnesses who not only testified that he was elsewhere at the approximate time of the robbery, but also that he was not in possession of the vehicle associated with the incident. In addition, he argues there was testimony that John Jones had admitted complicity in the robbery to others. Based upon this evidence, it is appellant's contention that a serious miscarriage of justice would be wrought if his conviction is permitted to stand.

In contrast to the exculpatory evidence and in addition to the other evidence of guilt, the jury heard the testimony of the victim who positively identified the appellant as the perpetrator. Such conflicting testimony addresses the sound discretion of the jury. Hankins v. State, 91 Nev. 477, 538 P.2d 167 (1975); Allen v. State, 91 Nev. 78, 530 P.2d 1195 (1975); King v. State, 87 Nev. 537, 490 P.2d 1054 (1971). Appellant acknowledges that the testimony of the victim, standing alone, would be sufficient to support his conviction. It follows that if this testimony considered alone is sufficient, it is no less sufficient in the presence of internally inconsistent testimony from the defense. The jury is at liberty to reject the defendant's version of events. Harris v. State, 88 Nev. 385, 498 P.2d 373 (1972).

The evidence, taken as a whole, amply supports the jury's verdict. This Court, in review, cannot assume the function of the jury to weigh the evidence. McGuire v. State, 86 Nev. 262, 468 P.2d 12 (1970). Accordingly, the conviction will not be reversed for this reason.

2. *Expert Testimony.*

Appellant, at trial, attempted to offer testimony from a clinical psychologist on the matter of eyewitness identification. The proposed testimony sought to challenge the validity of the eyewitness identification. The trial court refused to permit such evidence on the basis that the proffered testimony was not within a recognized field of expertise, the foundation was inadequate, and that it would invade the province of the jury. Appellant contends that the proposed testimony was critical to his defense and that its rejection was prejudicial error. We disagree.

At trial, Harry Hess, the offered expert, was a clinical psychologist holding a master's degree and Ph.D. in his field. During the foundational hearing he testified that clinical psychology was the application and practice of experimental psychology. Experimental psychology involves, in part, experiments in the retention and recollection of visual impressions. Although Dr. Hess had previously qualified in district court as an expert in the field of psychology, he had never testified as to the reliability of eyewitness identification. He was not acquainted with the victim, nor had he ever examined the victim's retention ability. His testimony was to consist of a review of authored works written by other persons which concluded that eyewitness identification is unreliable. Defense counsel then intended to propound a hypothetical question to Hess describing the circumstances of the identification in the instant case.

Without deciding whether the subject matter of Dr. Hess' testimony would have been a proper one for expert testimony, *see,* Warden v. Lischko, 90 Nev. 221, 523 P.2d 6 (1974), in the instant case, appellant simply failed to establish a viable foundation for the elicitation of the desired opinion, not only in terms of whether this type of expert testimony is within a recognized field of expertise but moreover respecting the witness' competency. *See,* NRS 50.275. Dr. Hess, if permitted to, would have testified with reference to the matters of retention and recollection of visual impressions. Appellant would have

offered Dr. Hess' opinion that, based upon Hess' readings, eyewitness accounts are not always reliable. There was no express showing that he would have addressed himself to the testimony of the victim with reference to Speake's retention and recollection capacity, the effect of stress, if any, on Speake's power of perception, or other relevant considerations. Rather, he would have testified about the unreliability of eyewitness accounts in general.

On this record, there existed a substantial risk that the potential persuasive appearance of Hess would have had a greater influence on the jury than the evidence presented at trial, thereby interfering with the province of the jury. United States v. Moia, 251 F.2d 255 (2nd Cir. 1958).

In United States v. Amaral, the court stated:

> The basic purpose of any proffered evidence is to facilitate the acquisition of knowledge by the triers of fact thus enabling them to reach a final determination.

488 F.2d 1148, 1152 (9th Cir. 1973). Here, there was no indication that the testimony would have aided the trier of fact. *See,* NRS 50.275.

Further, defense counsel had the responsibility, which he ably accepted, of cross-examining Speake to inquire into the witness's opportunity and capacity for observation, his attention and interest, and his capacity for retention and recollection. In the instant case, the victim was not under stress until the actual robbery; he had a prior ample opportunity to observe Porter absent stress-type conditions, *Amaral, supra,* and the victim had since immediately following the offense, through his testimony, consistently and with unmistakable certainty identified Porter as the perpetrator. Here, the evidence was substantial and, even had we reached the issue of competent subject matter and determined that it was proper and the witness qualified, rejection, on the instant facts, may have been harmless. *Compare,* United States v. Brown, 501 F.2d 146 (1974), *reversed on other grounds,* 422 U.S. 225 (1975).

The competency of expert testimony is within the sound discretion of the trial court, and its determination, absent a manifest abuse of discretion, will not be disturbed on appeal. Singleton v. State, 90 Nev. 216, 522 P.2d 1221 (1974). The trial judge did not err.

3. *Doctrine of Accumulated Error.*

Appellant contends that reference during the trial to his "mug shots" and the line-up procedure improperly implied that he had a previous arrest record. This in addition to an

allegedly prejudicial closing argument by the prosecutor amounts, he argues, to reversible error under an accumulated error doctrine.

It is without question that, absent special conditions of admissibility, reference to past criminal history is reversible error, Walker v. Fogliani, 83 Nev. 154, 425 P.2d 794 (1967); Marshall v. United States, 360 U.S. 310 (1959), but here appellant failed to object during trial to the alleged impropriety of reference to the "mug shots" and line-up procedures. Failure to object at trial precludes the issue on appeal. Wilson v. State, 86 Nev. 320, 468 P.2d 346 (1970).

We now turn to appellant's claim that he was deprived of a fair trial by improper and prejudicial prosecutorial closing argument. The prosecutor's suggestion that the defense witnesses were "a parade of perjurers and professional alibi witnesses" is a reasonable capsulization of appellant's claim that prejudicial error occurred during summation. Appellant objected to some, but not all, of the claimed prejudicial comments. The court sustained some and overruled the remaining, appropriately admonishing the jury. Two defense witnesses had recently testified as alibi witnesses in another robbery prosecution in Clark County. We cannot say that these comments were statements of a prosecutor not based upon or arising by inference from the evidence. State v. Cyty, 50 Nev. 256, 256 P. 793 (1927). Even if, *arguendo,* the remarks were considered to be improper, as to the unobjected to matter, appellant is now precluded from raising the issue on appeal. *Walker, supra,* Jackson v. State, 93 Nev. 28, 559 P.2d 825 (1977); Moser v. State, 91 Nev. 809, 544 P.2d 424 (1975); Clark v. State, 89 Nev. 392, 513 P.2d 1224 (1973). Nor do we perceive error respecting the remarks that were objected to.

4. *Denial of New Trial.*

Appellant argues that a new trial should have been granted on the basis of newly discovered evidence. NRS 176.515. The evidence consisted essentially of a purported polygraph examination of John Jones in which he allegedly truthfully admitted the robbery and the affidavit of a court-appointed investigator stating that Jones had admitted committing the robbery. Not only does this newly discovered evidence fail to meet the guidelines for granting a new trial as set forth in Oliver v. State, 85 Nev. 418, 456 P.2d 431 (1969), but the proffered evidence,

involving a polygraph examination, would be inadmissible evidence in any subsequent re-trial. *Lischko, supra.* In addition, the evidence proffered, even if material, was not newly discovered at all but was significantly referred to during trial. The record shows that, both before and during trial, Jones was known to the defense as a source of evidence as to the commission of the robbery. The new evidence could have been presented at trial by the exercise of reasonable diligence. It is therefore cumulative and corroborative, rather than new, and not such as to render a different result probable upon re-trial. *Oliver, supra.* The granting of a new trial upon grounds of newly discovered evidence is discretionary and will not be reversed on appeal absent an abuse of discretion. Lightford v. State, 91 Nev. 482, 538 P.2d 585 (1975).

The judgment of conviction is affirmed.

BATJER, C. J., and MOWBRAY and THOMPSON, JJ., concur.

GUNDERSON, J., concurring:

Although I can concur in the result reached by our brother Manoukian, I must respectfully note my belief that the above opinion lacks any acceptable rationale concerning the issue of expert testimony.

The opinion states that "appellant simply failed to establish a viable foundation for the elicitation of the desired opinion," despite the fact that appellant's proffered expert has earned both master's and Ph.D. degrees in clinical psychology, has extensive experience in that field, and has often been recognized by Nevada courts as an "expert" for purposes of giving testimony. Two reasons are articulated for this holding, i.e., that there is no showing [1] "whether this type of expert testimony is within a recognized field of expertise," and [2] "but moreover respecting the witness' competency."

1. The discourse following this preliminary statement does not even attempt to support the first ground—which is not surprising. Here, appellant's expert *was prepared to cite and discuss* scientific literature concerning the expertise which has been developed through scientific study of witnesses' capacity to report their observations with accuracy. Moreover, legal research discloses no case excluding testimony of this kind on the ground that it is outside a recognized field of expertise.

2. The above opinion's only attempt to justify the second ground mentioned, so far as I can see, is the statement: "There is no express showing that he [the expert] would have addressed himself to the testimony of the victim with reference to Speake's retention and recollection capacity, the effect of

stress, if any, on Speake's power of perception, or other relevant considerations. Rather, he would have testified about the unreliability of eyewitness accounts in general." Thus, in essence, the above opinion suggests that it somehow is improper to develop general testimony in an area of expert knowledge, and rely upon other evidence to relate such testimony to the case. This is contrary to both the evidence code and previous Nevada authority. *See* NRS 50.275; 50.285(1); Southern Pacific Co. v. Watkins, 83 Nev. 471, 435 P.2d 498 (1967); Wallace v. State, 84 Nev. 603, 447 P.2d 30 (1968); *cf.* Ginnis v. Mapes Hotel Corp., 86 Nev. 408, 470 P.2d 135 (1970); Shoshone Coca-Cola v. Dolinski, 82 Nev. 439, 420 P.2d 855 (1966); L.A. & S.L.R. Co. v. Umbaugh, 61 Nev. 214, 123 P.2d 244 (1942).

3. Following such discourse, which supports neither of the legal propositions first given as "grounds" for its holding, the above opinion proceeds into a discussion unrelated to either. Some of that discourse is patently unsound. For example, I suggest this court can hardly justify excluding expert testimony by asserting that "defense counsel had the responsibility, which he ably accepted, of cross-examining Speake." Defense counsel had no "responsibility" to cross-examine Speake. His responsibility was to defend appellant in the best manner legally available, and, if counsel's choices included the use of expert testimony, then counsel was free to use that method of defense exclusively, or to use it in conjunction with cross-examination. Moreover, if the court improperly forced counsel to proceed by cross-examination only, then we can hardly defend the court's error, by noting that counsel "ably accepted" the burden of attempting to impeach the witnesses solely by cross-examination. What kind of rule should our bench and bar elicit from such a commentary? I suggest that the only rule which can be educed—i.e., that trial courts may reject expert testimony with impunity, provided counsel unsuccessfully attempts to get the same information before the jury by cross-examination or by some other artifice—is patently unsound.

The above opinion also vaguely asserts that, had the trial court permitted appellant's expert to testify, "there existed a substantial risk that the potential persuasive appearance of Hess would have had a greater influence on the jury than the evidence presented at trial, thereby interfering with the province of the jury."

In Nevada, experts may testify as to ultimate issues of fact, even though such testimony traditionally invaded the province of the jury. *See* NRS 50.295; *Southern Pacific,* cited above, 83 Nev. at 488, 435 P.2d at 509. If the court intends to

carve out an exception to this general rule, then I believe we must likewise delineate the rationale for our decision. This would prevent confusion and erroneous extension of our holding beyond its factual setting.

4. After reading of the authorities dealing with the specific issues before us, I believe authorities exist to support affirmance, some based on vague rationale, and some with better logical focus. For example, some courts have said experts may not impeach eyewitness accounts because cross-examination is a more efficient method for testing credibility. *See* United States v. Amaral, 488 F.2d 1148 (9th Cir. 1973); Criglow v. State, 36 S.W.2d 400 (Ark. 1931). Another court declared that parties should not impeach witnesses by calling other witnesses, and thereby usurp the jury's task of determining witness credibility. *See* People v. Johnson, 112 Cal.Rptr. 834 (Cal.App. 1974). Providing somewhat more enlightenment, the Georgia Supreme Court recently concluded:

> Generally, expert testimony as to the credibility of a witness is admissible if the subject matter involves organic or mental disorders, such as insanity, hallucinations, nymphomania, retrograde amnesia, and testimony concerning physical maladies which tend to impair mental or physical faculties. If, however, the characteristic attacked does not involve some organic or mental disorder or some impairment of the mental or physical faculties by injury, disease or otherwise, expert testimony is usually excluded.

Jones v. State, 208 S.E.2d 850, 853 (Ga. 1974); *see also* 20 ALR3d 684.

The cases just cited reject the use of expert testimony to wage a general attack on the validity of direct eyewitness testimony. As to such a general attack, the case authority seems to show a policy decision to avoid a "battle of the experts" by carving out an exception to usual rules permitting expert testimony. In my view, such a policy decision is rational and acceptable, and should be set forth as the basis for our opinion.

5. Finally, I note the above opinion's concluding statement concerning the expert opinion issue, i.e., that any error "on the instant facts, *may* have been harmless," is meaningless at best. (Emphasis added.) I respectfully suggest that, when invoking the harmless error rule, this court should utilize care and restraint. Error is either harmless or it is not. That an error *may* be harmless should not be offered as an ambiguous apologia for uncertainty in other rationale. Our case law and credibility will not be benefited by such non-committal, makeweight declarations.

In view of all the foregoing, I respectfully suggest, with all due deference, that the above opinion fails to articulate any real rationale on the expert opinion question. I fear it will mislead more than enlighten.