387 So.2d 106 (1980)
FRUEHAUF CORPORATION
v.
TRUSTEES OF FIRST UNITED METHODIST CHURCH.
No. 52089.
Supreme Court of Mississippi.
August 27, 1980.
*107 Watkins & Eager, Michael W. Ulmer, Jackson, for appellant.
Holcomb, Dunbar, Connell, Merkel, Tollison & Khayat, John H. Cocke, Clarksdale, for appellee.
Before PATTERSON, C.J., and BROOM and LEE, JJ.
BROOM, Justice, for the Court:
Strict liability in tort was the basis of the action of the Trustees of the First United Methodist Church (plaintiff herein) against appellant Fruehauf Corporation. Another defendant, James R. Ashcraft, an individual, was jointly sued but on grounds of simple negligence. Trial in the Circuit Court of Coahoma County resulted in a $19,777.63 jury verdict in favor of the plaintiff as against Fruehauf but exonerating Ashcraft. Fruehauf appeals, contending that the plaintiff failed to make out a case against Fruehauf under our landmark case of State Stove Manufacturing Company v. Hodges, 189 So.2d 113 (Miss. 1966). We affirm.
Central to the case is a one-inch nipple connector, an integral element of a tractor/trailer hydraulic system. On the trailer *108 is a male quick-couple connection which comes from a hydraulic line; the male quick-couple snaps onto the female connection mounted on the tractor (commonly called the truck). The female quick-coupling screws onto the nipple which measures about two (2) inches in length and one and one-fourth (1 1/4) inches in diameter. The nipple screws into the base of a cylinder located on the trailer. Such a nipple was on the heavy-duty large dump trailer manufactured by Fruehauf which Ashcraft purchased on September 4, 1975, from Fruehauf's wholly-owned subsidiary, Hobbs Trailers, at Little Rock, Arkansas. On that same day, Ashcraft hooked the trailer (with the nipple installed) to his International tractor and drove away. Although the nipple was vital to the proper functioning of the trailer's dumping mechanism, apparently it was not connected to the towing or braking mechanism of the trailer/tractor vehicle. Within a short time after acquiring the trailer, Ashcraft traded his International tractor for a Kenworth. This necessitated connecting the Kenworth hydraulic system to the Fruehauf trailer, and allowed Ashcraft to continue using the original nipple.
Subsequent to purchasing the tractor on September 4, 1975, Ashcraft was using it on April 14, 1976, to deliver 44,000 pounds of sand to a construction site in Clarksdale, Mississippi, across the street from the plaintiff's church building. At that time Ashcraft had used the trailer some 15,000 miles. During the sand dumping process, the nipple in controversy here ruptured, causing highly pressurized hydraulic oil to spew across the street and into the plaintiff's sanctuary building resulting in $19,777.63 damages.
The plaintiff's (church's) insurer paid for the damages and brought this subrogation action against manufacturer Fruehauf and trailer operator Ashcraft. Ashcraft was exonerated by the jury which had before it the following issues: Was the nipple connector present on the trailer at the time it was delivered to Ashcraft? Was the nipple defective when delivered to Ashcraft?
Fruehauf concedes that the jury heard sufficient (though conflicting) testimony that the nipple connector was on the trailer when Ashcraft purchased it and no longer is that issue present in the lawsuit. Strenuously, Fruehauf argues on appeal that the plaintiff's case was insufficient to go to the jury because of the lack of evidence "of the presence of a defect in the nipple" when it left Fruehauf's hands after manufacture. Fruehauf moved for a directed verdict when the plaintiff rested and chose to present proof after the trial court rejected the motion for a directed verdict. In that posture, we will consider, in accordance with our rule, all of the evidence presented at trial.
Fruehauf primarily relies upon State Stove, supra, to support this proposition. In State Stove at 121, Chief Justice Ethridge, writing for the Court, stated:
[W]hether a product is reasonably safe or not is a flexible standard responsive to the facts of each case. Wade, 19 Sw.L.J. at 17. It is a question of fact whether the particular article involved was reasonably safe when it left the control of the manufacturer.
We found that State Stove Manufacturing Company was not liable for the destruction of the Hodges home where the electric water heater, manufactured by appellant, State Stove, exploded when the thermostats locked in the "on" position. We rejected the chancellor's finding, and ruled that the contractor's failure to install the temperature relief valve according to instructions attached by State Stove was the "intervening, sole proximate cause of the damages... ." State Stove at 123. The mere fact that the thermostats malfunctioned did not prove, we reasoned, that they were defective when manufactured, especially "after the lapse of seven months of use." State Stove at 123.
Fruehauf also cites Baker v. Ford Motor Co., 317 So.2d 51 (Miss. 1975). In Baker, we upheld the directed verdict in favor of the defendant on the ground that the plaintiff failed to show either by direct or circumstantial evidence that the defendant violated *109 some duty owed her. Our opinion by Presiding Justice Rodgers restated the three required elements to be proved in a strict liability torts case:
(1) that the manufactured product left the manufacturer in a defective condition, (2) that the product was in the same condition at the time of the accident as it was when it left the factory, and (3) that the defect in the product was the proximate cause of the injury. Ford Motor Co. v. Matthews, 291 So.2d 169 (Miss. 1974); Coleman v. Ford Motor Company, 240 So.2d 607 (Miss. 1970); States [sic] Stove Manufacturing Co. v. Hodges, 189 So.2d 113 (Miss. 1966).
(317 So.2d at 52).
See also William Cooper and Nephews, Inc. v. Pevey, 317 So.2d 406 (Miss. 1975).
The plaintiff in contradistinction to State Stove, relies upon another line of our cases. In Early-Gary, Inc. v. Walters, 294 So.2d 181 (Miss. 1974) we affirmed the chancellor's award of damages to a customer whose hand was severely injured when he attempted to loosen the cap of new Heinz Ketchup bottle by bumping the inverted bottom of the bottle with the palm of his right hand. The bottle broke off; the wall of the bottle remained intact; and his hand was severely cut upon impact. After hearing testimony establishing the chain of control over the bottle from the time Heinz shipped it to the time it was purchased by Early-Gary, the chancellor determined that the defect existed when the bottle left Heinz. In addition, both the waitress and Mr. Walters testified that the bottle was not obviously defective.
In another bottle case, Falstaff Brewing Corp. v. Williams, 234 So.2d 620 (Miss. 1970), we affirmed the chancellor's award of damages as being supported by substantial evidence. The beer was bottled and shipped from New Orleans to Natchez and delivered in the original cases to Bob's Eats. The bottle was placed in the cooler and exploded without being touched, causing the plaintiff to suffer a severe eye injury when struck by the exploding bottle. Justice Robertson authored Falstaff and quoted from a decision by Justice Traynor in Escola v. Coca-Cola Bottling Co. of Fresno, 24 Cal.2d 453 at 461, 150 P.2d 436 at 440-441 (1944):
"[P]ublic policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market. It is evident that the manufacturer can anticipate some hazards and guard against the recurrence of others, as the public cannot."
Merely distinguishing the present case factually from the fact patterns of our earlier cases will not resolve the issue here. The nipple here is not a thermostat and is without movable parts which are ordinarily subject to wear and abuse.
The plaintiff argues that upon ample evidence and proper instructions, the jury found that the nipple was defective when it left Fruehauf's hands. Additionally, the plaintiff points out that, according to Ashcraft's testimony he, (the sole operator) had in no way misused the trailer on the day of the incident, altered the nipple, or adjusted the pressure relief valve so as to exert too much pressure on the nipple or otherwise to cause it to burst. Also noted by the plaintiff is the fact that after the nipple was replaced with one obtained from a hardware store, the hydraulic system never malfunctioned again. Another testimonial aspect of the case relied upon by the plaintiff is that Ashcraft's expert Ellison, (subpoenaed by Fruehauf, Ellison's employer), testified in effect that the explanation for the bursting of the nipple would be either a defect in the nipple itself, misuse of the nipple, or overpressurization. Ellison pointed out that the nipple in question was of lesser size and weight than that which Fruehauf Corporation would normally use on a trailer of this type. He concluded that rupture of the nipple indicated a defect or malfunction which would not necessarily have manifested itself prior to the occurrence in question.
Plaintiff asserts that proof that the system operated perfectly after the "defective nipple was replaced, eliminates the possibility of over-pressurization as a cause of the *110 malfunction, because if there were a problem with the pressure, the replaced nipple would have burst as well." Plaintiff further contends that the only logical conclusion for the jury to reach then was that the defect must have been present when the trailer was sold by the defendant Fruehauf. We think the proof adequately eliminated any other causes for the defect at least to the point of raising a jury issue.
Cases cited and discussed establish that there are two types of proof which may be presented in a products liability case of this sort. There may be direct evidence from an individual who witnessed the occurrence in question and testifies from his own personal knowledge. Such a witness, of course, would be able to testify that he observed a defect in the product when it left the manufacturer. Other types of evidence are circumstantial including "expert" and "inferential" evidence. A qualified expert, although not present when the product was manufactured, or at the time of the occurrence of an injury, may express his opinion as to whether a defect existed in the product at each of the relevant times. Shoshone Coca-Cola Bottling Co. v. Dolinski, 82 Nev. 439, 420 P.2d 855 (1966) presents a case where liability was properly imposed upon the defendant who presented no expert testimony. There the case involved a decomposed mouse found inside the defendant's bottle of soda pop. In such a case expert testimony is hardly necessary to prove that the mouse, an obvious "defect," was in the bottle when it left the defendant's hands, because anyone knows that a mouse cannot crawl into a capped bottle of Coca-Cola. Fruehauf raises the following question: Is it within the realm of general public knowledge that a hydraulic nipple connector could function perfectly well for over seven months and then fail, not because of anything which happened to it during the time it was in use, but because of something done or not done when the product was manufactured?
Fruehauf says that the plaintiff's failure to offer expert testimony to establish the existence of a defect in the nipple connector when it left Fruehauf's hands is fatal because the plaintiff did not offer the best proof available: the opinion of a qualified expert, Dr. Allen Wehr, that the defect existed in the trailer when it left Fruehauf's hands. It is true that in cases of this sort the plaintiff has the burden to produce such proof or account, on the record, for its failure to do so. As stated in William Cooper and Nephews, Inc. v. Pevey, supra,
In Masonite Corporation v. Hill, 170 Miss. 158, 154 So. 295 (1934), this Court recognized the desirability of proving facts capable of direct proof by chemical analysis if such proof is reasonably available to the party who has the burden of proof. Circumstantial evidence may be used to prove the defect in cases where there is no other way to establish it. (317 So.2d at 408-09).
Here, the record clearly shows that the nipple was intact until Ashcraft attempted to remove it from the trailer after the accident. He stated that he could not recollect what he did with the parts of the nipple after removal from the trailer, but the record does show that one of the pieces of the part was submitted to a metallurgist at Mississippi State University for his examination. However, Ashcraft was uncertain as to what was done with the other portions or pieces of the nipple. We do not find in the record any evidence which would establish that the portion of the nipple available to the plaintiff for examination by an expert was insufficient in size or otherwise to be examined by an expert who could then form his opinion about any defect thereof. It is true that during an in-chambers discussion between counsel and court, Attorney Merkel (plaintiff's counsel) stated that Mississippi State expert Wehr (who was subpoenaed by both Fruehauf and the plaintiff) told him "the fragment that was there, it was too small and too damaged by the external forces that removed it at the welding shop for him to give any opinion whatsoever as to what caused it to fracture or burst." According to the record after Attorney Merkel made the statement concerning what an expert who was not present to *111 testify would (adversely to plaintiff) say, the court made the following statement:
BY THE COURT:
Well, this is not  certainly you have made your record, but the Court is not basing anything on what... the witness may or may not have said if he was here, and for the same reason that's not proper at this point, particularly under the circumstances that exist here now. Had they in fact failed to bring this man, or released him without Mr. Ulmer having made a motion to prohibit him from testifying, there might be some inference. I say "Might be". I'm not ruling on that, but there might have been some inference that this so-called expert would have testified adversely to the Plaintiff or to Defendant Ashcraft had he not been brought here, and had there been no objection or motion asking the Court to prohibit him from testifying.
The trial court, acting within his sound judicial discretion, thus recognized the infirmity contained in the attempt of Fruehauf's counsel to leave with the jury an inference (adverse to the plaintiff) that expert Wehr examined the controversial "part" for plaintiff and found nothing wrong with it. Under the general rule, if the pieces of the allegedly defective part were insufficient in size so that an informed determination as to the existence of a defect in the nipple could not be made, the plaintiff's burden was to present admissible testimony to that effect. Then the plaintiff clearly could have justifiably relied upon another type evidence: circumstantial. Except for the unusual circumstances existing here, the plaintiff should have put expert witness Wehr (with whom the church's attorney admits discussing the question of a defect in the part in question) on the witness stand to explain to the jury how it is possible, if possible it is, for a part such as a nipple connector to function perfectly well for seven months and then suddenly to rupture in normal use.
As concerns the failure of the plaintiff to offer expert Wehr's testimony, as pointed out in the plaintiff's (appellee's) brief, the trial court entered an order precluding the church from calling Wehr. Ironically, the preclusion order was entered in response to Fruehauf's motion based upon the plaintiff's failure to respond to Fruehauf's interrogatories seeking information concerning Wehr's opinion and the facts upon which it was based. Having no response to its interrogatories, Fruehauf filed a demand for supplementation. When there was still no response, Fruehauf moved the court to order preclusion of the church and its co-defendant Ashcraft from calling any expert witness to support its case. Fruehauf's motion was sustained thereby precluding the plaintiff from calling the expert Wehr. Excerpted from the record is the following:
BY MR. ULMER: I was just going to say, their own failings in not answering interrogatories got them into this situation where I filed my motion. And, again my motion was designed to keep an expert from coming up here and bolstering or supporting their testimony.
BY THE COURT: Well, you asked that he be prohibited from testifying and as you say bolstering or supporting, now when you do that, you simply can't  this Court will not permit you to do by inference what  You had the opportunity, if what you infer is correct, then the Court doesn't see why you didn't have the witness to come on. But, I will direct the jury to disregard that question.
BY MR. MERKEL: Your Honor, we would think, too, that they should be instructed either now or at the time you do this, or at the close of the evidence that the so-called expert who examined it was equally available and under subpoena of all parties, and that no inference whatsoever should be drawn from his absence at this trial.
BY MR. ULMER: Your Honor, I take strong exception to that. He's not equally accessible and available to me. He was hired by Allan Shackelford, and if Allan had so desired he could have kept me from talking to him, putting him on the stand, or doing anything of that nature.
BY MR. SHACKELFORD: Your Honor, may I inquire of Counsel 

*112 BY THE COURT:  (Interrupting)  The Court will inquire. Did he keep you from talking to him?
BY MR. ULMER: No, sir, I talked to the man.
BY THE COURT: All right, sir.
BY MR. MERKEL: Well, am I not correct, Shack, that you told him he could bring him here, hire him, pay him, whatever he wanted to?
BY MR. SHACKELFORD: Whatever he wanted to.
BY THE COURT: All right, I will make such statements as the Court deems appropriate.
(COURT, ALL COUNSEL & COURT REPORTER RETURN TO THE COURTROOM)
IN COURTROOM  JURY IN BOX
BY THE COURT: Ladies and gentlemen of the jury, the Court has sustained and did sustain the objection of Counsel to the question asked of the witness regarding what was termed an expert by Mr. Ulmer, the attorney for Fruehauf. You will disregard that question, and you will disregard any inference that might arise from that question, since the Court sustained the objection to the asking of the question or the answer. Any evidence that you receive will be presented from the witness stand and not by inference. Any witnesses that either of the parties desire to call may be called or subpoenaed, and you will accept only those, and only that evidence that you receive from the witness stand.
Ordinarily failure of a party to offer his own expert as a witness creates a situation from which the jury may be allowed to infer that failure to produce the witness shows that such testimony would have been adverse to such a party, the plaintiff here. Upon this most peculiar record, we do not think that the court committed reversible error in instructing the jury to disregard any inference that might arise from the question propounded by Fruehauf's counsel concerning metallurgist Wehr, and the failure of plaintiff to produce Wehr's testimony.
The case went to the jury upon proper instructions and we find that the evidence presented by the plaintiff was sufficient to support the jury's finding that the nipple was defective when it left the hands of Fruehauf. According to the uncontradicted evidence, the nipple ruptured which ordinarily does not happen if the item is non-defective, and used in a reasonable manner. As a consequence, the plaintiff, though totally without fault, suffered substantial damages. Expert Walter Ellison related rupture of the nipple to either of three explanations: the nipple was defective, misused, or over-pressurized. The plaintiff's proof was sufficient basis upon which the jury could find (as it did) that the rupture resulted from a defect in the nipple rather than from either one of the other two explanations. Upon excellent briefs and oral argument, our finding is that there was sufficient evidence to submit the case to the jury and no reversible error has been demonstrated.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, LEE, BOWLING and COFER, JJ., concur.